Keith Daniel WILLIAMS,
Petitioner–Appellant,

v.

Arthur CALDERON, Warden,
San Quentin State Prison,
Respondent–Appellee.

No. 93–99006.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 14, 1994.

Decided April 7, 1995.

1466

Richard B. Mazer, San Francisco, CA, and David A. Nickerson, Sausalito, CA, for petitioner-appellant.

J. Robert Jibson, Deputy Atty. Gen., Sacramento, CA, for respondent-appellee.

Before: POOLE, DAVID R. THOMPSON, and TROTT, Circuit Judges.

POOLE, Circuit Judge:

Petitioner Keith Daniel Williams, sentenced to death for committing three murders, appeals the district court's denial of his petition for a writ of habeas corpus. We

have jurisdiction under 28 U.S.C. §§ 1291 and 2253. Although we agree that some of Williams' claims identify defects in his sentencing, none of these flaws rise to the level of prejudicial or harmful error warranting habeas relief. We therefore affirm.

## I

Keith Daniel Williams, Robert Tyson, and three others were out driving on Saturday, September 30, 1978, when their car broke down. Williams and Tyson decided to rob a nearby camper. They forced the couple occupying the vehicle out and, as the couple fled, Williams fired several shots over their heads into the air.

In part to sell off the contents of the camper, Williams, Tyson and others[1] held a yard sale. On Friday, October 6, Miguel Vargas, Salvadore Vargas and Lourdes Meza came to the sale. Miguel expressed interest in selling his car for $1500. He returned the next day with Meza and agreed to sell the car. One of the members of the group wrote out a check on a checkbook stolen from the camper. Vargas also expressed interest in buying Williams' Beretta.

After Vargas and Meza left, Williams told Tyson how easy he thought it would be to "just get rid of them." A rough plan was formed to go to their place in Merced and retrieve the bad check; Williams intended to kill the three. Williams proceeded to clean his and Tyson's guns. That night, he sent two of the women in the group out to hustle money or prostitute themselves in order to obtain gas money. When that failed, Williams himself went out Sunday morning and sold a camera, and others in the group cashed more checks from the stolen checkbook. With money for gas, Williams and Tyson then left for the Vargas' farmhouse. They stopped along the way and had at least two beers.

Upon arrival, Williams and Tyson found Miguel Vargas, Salvadore Vargas, Meza, and three others. They drank and discussed selling Williams' gun. After the others left, Williams and Tyson retrieved their guns from the car. Williams pulled a gun on Miguel Vargas, but Tyson turned the situation into a joke and Williams and Tyson left briefly, purportedly to get beer. They returned within 15 minutes with guns drawn. Williams ordered Tyson to guard Miguel while he went upstairs. There he found Salvadore and Meza. Williams ordered Tyson to bring Miguel upstairs and take Meza downstairs and "take care of her." After asking where the bad $1500 check was, Williams shot Salvadore and Miguel twice each.

Williams retrieved two guns, Meza's purse, and the check, and the three then left the farmhouse. They drove for more than an hour, during which time Williams had intercourse with Meza in the back seat. When the three finally stopped in a remote area, Williams took Meza from the car and shot her four times. Meza's naked body was left abandoned in a field.

During this entire period, Williams consumed a disputed amount of alcohol, morphine, codeine, heroin and marijuana.

Williams and Tyson returned to the Tyson's place, and Williams then left for good. Tyson became nervous and confessed to the police within the week; Williams was picked up the next month and also confessed.

Williams was charged with murder with special circumstances under California's 1977 death penalty law. He pleaded not guilty by reason of insanity, and was examined by two court appointed psychiatrists, Drs. Brannan and Lloyd, each of whom found him sane. Williams' defense proceeded on a theory of diminished capacity. Williams was found guilty on three counts of first-degree murder. The jury found nine of 10 special circumstances true—six multiple-murder circumstances, two robbery circumstances, and one kidnapping circumstance. It found not true the charged rape circumstance. The jury then found Williams sane, and returned a sentence of death on all three counts.

1. At the time, a group of five adults was living at the Tysons', including Williams, Robert Tyson, Karen Tyson (Robert Tyson's common-law wife), Cindy Williams (Williams' ex-wife), and "Betsy" (Cindy's cousin).

Williams' appeal and first state habeas petition were denied in their entirety. *People v. Williams,* 44 Cal.3d 883, 245 Cal.Rptr. 336, 751 P.2d 395, *cert. denied,* 488 U.S. 900, 109 S.Ct. 249, 102 L.Ed.2d 237 (1988). His second state habeas petition received a postcard denial. Williams then filed his first federal habeas petition. The district court, after granting an evidentiary hearing only on Williams' claim that the prosecution presented perjured testimony, and after considering the case for 26 months, denied all 19 of Williams' claims. *Williams v. Vasquez,* 817 F.Supp. 1443 (E.D.Cal.1993). This timely appeal followed.

■ We review de novo the district court's denial of William's petition for a writ of habeas corpus. *Brown v. Borg,* 951 F.2d 1011, 1014 (9th Cir.1991). We consider first, in §§ II–V, four alleged trial errors. Williams contends that 1) he was denied effective assistance of counsel due to his attorney's incompetence, 2) he was denied effective assistance of counsel because his attorney was burdened by a conflict of interest, 3) he was denied his constitutional right to psychiatric assistance, and 4) his trial was infected by the perjury of the prosecution's main witness. In §§ VI–VIII, we next consider instructional and penalty-phase challenges by Williams to 1) the jury's special circumstance instructions, 2) the adequacy of the guidance the penalty-phase instructions provided the jury, and 3) the trial court's consideration of various allegedly impermissible factors in ruling on a motion to modify Williams' sentence. In § IX, we review procedural challenges to the district court's handling of this case, including its denial of an evidentiary hearing on all but one of Williams' claims. Finally, in § X, we consider Williams' constitutional challenges to the overall sentencing scheme applied to him.

## II

■ Williams contends that he was denied the effective assistance of counsel at the guilt, sanity, and penalty phases of his trial.

We review de novo the denial of this claim. *Paradis v. Arave,* 20 F.3d 950, 959 (9th Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 915, 130 L.Ed.2d 796 (1995). We agree with the district court's conclusion that Williams was not prejudiced by his counsel's performance.

Under the familiar *Strickland* test, Williams must establish both deficient performance by counsel and that that deficiency prejudiced him. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). "The essence of an ineffective assistance of counsel claim is that 'counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Paradis,* 20 F.3d at 959 (quoting *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2063). In establishing prejudice, Williams "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687, 104 S.Ct. at 2064.

### A

■ The gravamen of Williams' complaint is that his trial counsel, Roland Howard ("R. Howard"), failed to conduct an adequate investigation of a possible diminished capacity defense.[2] *See Sanders v. Ratelle,* 21 F.3d 1446, 1456 (9th Cir.1994) ("[C]ounsel must, at a minimum, *conduct a reasonable investigation* enabling him to make informed decisions about how best to represent his client." (emphasis in original)). Here, Williams alleges that R. Howard failed to examine Williams' previous medical records or to seek appointment of an independent psychiatrist to examine Williams, and was unaware of California Penal Code § 987.9, authorizing funding for experts for indigent defendants in capital cases. Williams presents declarations from five psychiatrists who have examined him

---

2. Williams also mentions in passing, without explication or argument, numerous other alleged defects in counsel's performance. To the extent that this discussion properly preserved these issues on appeal, the district court addressed them correctly. *Williams,* 817 F.Supp. at 1463–70, 1473–78.

since 1988 who now say that he was suffering from diminished capacity at the time of the killings.

Like the district court, we decline to consider whether Williams has established cause, because we conclude that he cannot establish prejudice.[3] In reaching this conclusion, we need not ask whether introduction of the opinions of the five favorable psychiatrists Williams has now found would have made a difference to the jury in 1979, as Williams would have us do. Instead, we consider whether, if Howard sought appointment of a psychiatric expert, and if, upon evaluation, that psychiatrist reached conclusions approximating those of Williams' habeas psychiatrists (rather than confirming the opinions of Brannan and Lloyd), such testimony, combined with the introduction of Williams' medical records, would have made a difference. We can only conclude that it would not.

The defense proceeded on a theory of diminished capacity; Williams does not challenge this decision, arguing only that stronger evidence should have been identified and introduced. However, contrary evidence of Williams' intent to kill and his ability to maturely and meaningfully reflect on his actions was simply overwhelming. *See* Cal.Penal Code § 188 (defining malice); *People v. Horn*, 12 Cal.3d 290, 298, 115 Cal.Rptr. 516, 524 P.2d 1300 (1974) (defining premeditation). Williams' own testimony, both on the stand and during a taped confession played for the jury, was so clear, lucid, and powerful that no psychiatrist would have made a difference. He described in meticulous detail how he decided the previous day to rob and "get rid of" the people to whom he had just sold his car, and how he cleaned his guns, obtained gas money, carried out the killings,

and fled from the state. Williams never suggested nor gave any reason to believe that he had had difficulty thinking clearly; the one excuse he offered instead was that the Vargases had moved toward him right before he shot them, a theory of self-defense discounted by forensic evidence and ultimately rejected by the jury. Karen and Robert Tyson each corroborated Williams' actions, intentions and lucidity in all material aspects. We have thoroughly reviewed the trial transcript and record, and we believe it leaves no room for doubt. The introduction of Williams' medical records, combined with the possibility that one psychiatrist might have testified to diminished capacity in place of Drs. Brannan and Lloyd, does not suffice to establish "a probability [of a different result] sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. Even had such evidence been introduced, we are fully confident the jury would still have concluded that Williams acted with premeditation and malice aforethought.

**B**

■ Williams argues that he need not show prejudice at the sanity phase because counsel's abandonment of Williams "caused a breakdown in [the] adversarial system of justice." *United States v. Swanson*, 943 F.2d 1070, 1074 (9th Cir.1991); *accord United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). We disagree.

At the sanity phase, no witnesses were called; R. Howard instead read the entirety of Drs. Lloyd's and Brannan's reports into the record. Each had concluded Williams was sane. As Williams correctly notes, the jury's decision in this phase was preordained.

---

3. Furthermore, we applaud the district court's decision to rest its decision on this basis. An unfortunate offshoot of death-penalty litigation has been the recurrent demonization of prior counsel—no doubt sometimes justly, but sometimes not—through the inevitable filing of *Strickland* claims. Death penalty counsel, whether trial or appellate, face the most demanding challenges the profession has to offer. *Wade v. Calderon*, 29 F.3d 1312, 1333 (9th Cir.1994) (Reinhardt, J., concurring), *cert. denied*, — U.S. —, 115 S.Ct. 923, 130 L.Ed.2d 802 (1995). Review-

ing their performance years later is never easy. If the absence of prejudice can be clearly established, we do well to decline the enterprise. *See Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069 ("The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.")

It does not follow, however, that because the jury's decision was a foregone conclusion, R. Howard abandoned his client. We do not equate an unwinnable case with abandonment. At the time of the trial, no experts had concluded Williams was not sane. Indeed, even today, none of Williams' habeas psychiatrist declarations indicate Williams was not sane.

R. Howard's response to this evidence contrasts sharply with the reaction of counsel in *Swanson,* on which Williams principally relies. In *Swanson,* counsel conceded in closing that the evidence was overwhelming and that there was no reasonable doubt as to his client's guilt. *Swanson,* 943 F.2d at 1077–78. Here, R. Howard argued that "there is ample evidence in those reports [of Lloyd and Brannan] that ought to raise some question in your minds with regard to this particular issue." RT 4/10/79 at 1539. He emphasized to the jury that the question of sanity rested with them, not the doctors, and that they should "not simply be rubber stamps for someone else's decision." RT 4/10/79 at 1547. He reminded the jury of the evidence admitted during the guilt phase which might bear favorably on the question of sanity. In light of the evidence, R. Howard did all he could.

Because R. Howard did not abandon his client, Williams' claim must be measured under the usual *Strickland* standard. Williams can show no sanity-phase prejudice. No evidence existed then that Williams was not sane; even today, no psychiatrist has said Williams was not sane.[4]

## C

Finally, Williams argues that in addition to not adequately investigating a diminished capacity defense,[5] as previously discussed, R. Howard also failed to investigate other potential mitigating evidence, including evi-

dence of childhood difficulties. Moreover, Williams argues that in reading Drs. Lloyd and Brannan's reports to the jury during the sanity phase without seeking a proper limiting instruction, Howard introduced damaging information that the jury could then consider in aggravation. These errors, Williams contends, prejudiced him during the penalty phase of his trial. We are not persuaded.

■ Howard presented no mitigating evidence during the penalty phase trial. However, mitigating evidence was presented in the course of the guilt phase, which the jury was entitled to consider in its determination of sentence. Cal.Penal Code § 190.4(d).[6] This included evidence of Williams' premature birth, early health problems, epilepsy, head injuries, voluntary psychiatric commitment, mother's alcoholism, lack of contact with his natural father, and parental abuse, including beatings by Williams' stepfather. The jury was never informed that Williams was illegitimate, or that he apparently suffered from fetal alcohol syndrome. While counsel could have provided more detail in support of these mitigating factors, we agree with the district court's conclusion that "the jury was exposed to much of the evidence [Williams] complains was omitted due to counsel's error." *Williams,* 817 F.Supp. at 1462. This greatly diminishes any impact the failure to further investigate possible mitigating factors may have had.

■ Brannan and Lloyd's reports, read into the record by R. Howard, contained numerous statements which Williams now challenges as prejudicial. These included statements from Williams that:

he thinks this whole trip is a bunch of "S." He said he would just like to get it over with and take what is coming to him.

He does not think jail will do him any good....

4. This fact also defeats Williams' claim that R. Howard rendered ineffective assistance by failing to object to the giving of a *M'Naghten* insanity instruction. Absent any evidence of insanity, the error cannot create a reasonable probability of a different outcome.

5. Counsel did in fact rely heavily on a diminished capacity defense, but the evidence introduced

related almost exclusively to diminished capacity arising out of Williams' ingestion of drugs and alcohol, rather than mental illness.

6. All references in this opinion are to California's former § 190, in effect from August 1977 until November 1978.

He said that if he does twenty years in prison he will get out and probably do the same thing again.

. . . . .

. . . . .

He sums it up by telling me that, one, he rejects authority and always will. Two, he does not go for the rehab bullshit. Three, he goes by the same code of ethics whether he is inside or outside of jail. Four, he is very prejudiced against Mexicans. RT 4/10/79 at 1526. In addition, Dr. Brannan opined that "I think he remains a danger to the health and safety of others, himself included. The reason I say this is because I think he is sociopathic, impulsive, and acts without thinking...." RT 4/10/79 at 1528. The reports also recounted a substantial prior history of assaultive conduct. While some of this information came in at other portions of the trial (for instance, Williams himself testified that "I don't particularly like Mexicans, period"), much of it did not.

We have no doubt that these statements did nothing to advance Williams' cause. We cannot conclude, however, that they materially harmed him, because the evidence militating against leniency towards Williams was already overwhelming. Williams, indeed, was his own worst enemy; from his testimony alone the jury could already have drawn many of the same conclusions Dr. Brannan reached and related.[7] The corroboration of the Tysons further augmented the profile. In short, Brannan's report, while highly unflattering, did not materially worsen Williams' case.

On this record, Williams cannot show that these alleged errors, including the failure to more fully investigate diminished capacity, prejudiced him. In light of the grievous nature of the crimes and Williams' relentlessly indifferent attitude towards them, we find no reasonable probability that the jury would have reached any verdict other than death.

## III

■ Williams raises a second Sixth Amendment claim, arguing for reversal because his attorney represented him while subject to a conflict of interest, thereby depriving him of his right to effective assistance

7. For instance, Williams discussed the murders in a taped confession played for the jury:

A [Williams]: So, we went up there [to the Vargases' farmhouse] and, uh, went in—first there was a bunch of people there. We had something to drink. We was drinkin' and stuff and, uh, we left and (yawn) went back about a half-hour later, everybody was gone except for, uh, these two dudes and this chick. Uh, killed these two dudes upstairs in the bedroom.

Q [Officer]: Who killed them?

A: I did.

Q: You did. Well, how did—how did you do that?

A: Well, we went to the door. Bob threw down on them when we went to the door and I was still on the outside and he went in. The dude, the chick's old man was downstairs, he's the one who answered the door.

Q: Which one was he? The smaller one or the bigger one?

A: I don't know, he was just a Mexican.

Q: Just a Mexican.

A: We backed 'em up. I went upstairs and the chick and the dude was upstairs, the chick was in the bathroom, the dude was coming out of the bedroom, and I put him—both down on the ground on the landing there and then I called Bob, had him bring the other dude up, and told Bob to go down and take care of the chick. So he took her downstairs. I killed the two Mexicans upstairs, walked down and Bob, he couldn't—he couldn't kill her. So I started to shoot her there, but, it was, like he was getting all freaked out and everything so I told him to grab her ... and we left.

. . . . .

Q: How long were you with [Meza] before you went back to the car?

A: A minute, time to walk up there, shoot her, turn around and walk back. The reason I didn't, cause, I was gonna shoot Bob cause of the way he was acting and way he was doing things, he was just, you know, the dude was freakin' out on me and everything. I had full intentions of shooting him.

Q: Up there?

A: Yeah. So I was gonna shoot him too. And the dude started sniveling and crying and started telling me, I don't know, a bunch of shit, find that weak ... you know, and I threw down the gun when I went back to the car, I started talking to him through the open window and the dude started sniveling and crying and shit. I just got, you know, I was mad, and I just got in the car and took off. We went back to his house and, uh, I split.

Q: When you went up there, did you put her right down or something or did you, was she standing up when you shot her?

A: No. She was down. I just put her down and I shot her in the back of the head.

Q: How many times did you shoot her?

A: Four.

of counsel. According to Williams, the fact that payment for any investigation or psychiatric services could have come from counsel's pocket forced counsel to choose between Williams' interests and his own. We discern in this situation no conflict of constitutional dimension.

Because Williams raised no objection at trial, "[i]n order to establish a violation of the Sixth Amendment ... [he] must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980). Admittedly, this and other circuits have previously recognized that a *Cuyler* claim may in theory lie where an attorney's financial interests are in conflict with his client's interests. *See United States v. Hearst,* 638 F.2d 1190, 1193–94 (9th Cir.1980) (holding allegation that attorney acted contrary to client interests based on book contract stated claim), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981); *Buenoano v. Singletary,* 963 F.2d 1433, 1438–39 (11th Cir.1992) (same). Of course, the Model Rules and Model Code regulate and restrict such situations and recognize that they pose conflict of interest problems. Model Rules of Professional Conduct Rule 1.8(d) (1991); Model Code of Professional Responsibility DR 5–104(B) (1981).

We decline Williams' invitation to extend *Cuyler* from that recognized conflict of interest to the present situation. Representation of rich and poor alike is one of the nobler ideals of the legal profession: "nowhere is ... service [to clients] deemed more honorable than in case of appointment to represent an accused too poor to hire a lawyer." *Frazer v. United States,* 18 F.3d 778, 784 (9th Cir.1994) (quoting *Von Moltke v. Gillies,* 332 U.S. 708, 726, 68 S.Ct. 316, 324, 92 L.Ed. 309 (1948) (plurality opinion)). The quality of such representation might well improve if counsel were to volunteer to place her private financial resources at defendant's disposal. As the district court correctly noted, counsel is under no obligation to do so. *Williams,* 817 F.Supp. at 1473. All Williams alleges is the same theoretical conflict that exists between an attorney's personal fisc and his client's interests in any pro bono or underfunded appointment case. Such arrangements, without more, do not require Sixth Amendment scrutiny.

## IV

Williams argues that he was denied his right to psychiatric assistance at trial, as defined by *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Because Williams failed to establish entitlement to an independent psychiatrist, we find no *Ake* error.

The due process guarantee of fundamental fairness requires that a state provide indigent defendants with the "basic tools of an adequate defense or appeal." *Id.* at 77, 105 S.Ct. at 1093 (quoting *Britt v. North Carolina,* 404 U.S. 226, 227, 92 S.Ct. 431, 433, 30 L.Ed.2d 400 (1971)). In some cases, access to a psychiatrist may constitute one of those tools. Consequently,

> when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

*Id.* at 83, 105 S.Ct. at 1096. This requirement is not satisfied by the provision of a neutral psychiatrist answerable to the court or the opportunity to cross-examine that expert. *Smith v. McCormick,* 914 F.2d 1153, 1158–59, 1163 (9th Cir.1990). Instead, due process requires the appointment of one psychiatrist for use by the defense in whatever fashion defense counsel sees fit. *Id.* at 1157.

We need not delve into the murkier substantive issues involved in Williams' *Ake* claim, as the district court did, because we conclude that the necessary procedural predicate has not been met. *Ake* makes clear that psychiatric assistance is a contingent, not an absolute, right: it holds that *"when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial"* the state must provide psychiatric assistance. *Ake,* 470 U.S. at 74, 105 S.Ct. at 1091–92 (emphasis added); *accord id.* at 82, 105 S.Ct.

at 1096 (the right to a psychiatrist is invoked "[w]hen the defendant is able to make an *ex parte* threshold showing to the trial court that his sanity is likely to be a significant factor . . . .").

Williams never moved for appointment of an independent psychiatrist, nor did he ever attempt to demonstrate to the judge that his mental state would be at issue. Williams' counsel, Roland Howard (R. Howard) made only an informal, in camera inquiry as to whether any "investigatory funds" might be available; the "impression" he received was that none were. Such a nonspecific inquiry does not satisfy Williams' obligation "to make an *ex parte* threshold showing" of the need for a psychiatrist. This failure to seek assistance is fatal to Williams' *Ake* claim.

Williams suggests that *Smith* holds the failure to object to the denial of a psychiatrist immaterial, based on the following language: "Again, even if [petitioner] had not so objected, the principal basis of the *Ake* claim would still remain: he was not provided a psychiatric expert charged with assisting him in his defense." *Smith,* 914 F.2d at 1162. The objection at issue was not to the failure to provide a psychiatrist, but to the forwarding of a court-appointed psychiatrists' report directly to the court. *Id.* Moreover, the flaw in Williams' case lies not in any failure to object, but in the failure to make an affirmative showing necessary to trigger the right he seeks to vindicate. *Smith* is in fact entirely consistent with *Ake;* the majority and dissent exhaustively debate whether Smith's counsel properly sought an independent psychiatrist. *See id.* at 1160–62; *id.* at 1171–73 (Fernandez, J., dissenting).

## V

■ Williams contends that the prosecution failed to disclose two deals it had cut with its chief witness, coconspirator Robert Tyson, then allowed Tyson to perjure himself by denying he had been promised anything for his testimony. After an evidentiary hearing, the district court concluded neither of the alleged deals existed. We will not reverse that factual finding absent clear error. *Amadeo v. Zant,* 486 U.S. 214, 223, 108 S.Ct. 1771, 1777, 100 L.Ed.2d 249 (1988). In light of the conflicting evidence presented, the district court's conclusion was not clearly erroneous.

■ Robert Tyson was the state's principle witness against Williams. At the time of his testimony, he had already been tried and sentenced. At the close of his testimony, he testified that the district attorney's office had made no promises with regard to charges against him, and that no promises had been made in return for his testimony. According to Williams, this was perjury. He alleges that two deals existed, one regarding parole and the other regarding the death penalty. We consider each in turn.

### A

Robert Tyson testified to irreconcilably different versions of the parole deal. In one version, given in 1988, he was contacted after his conviction by the District Attorney's office. The District Attorney's office threatened that he could "rot in prison" but offered not to oppose parole when he became eligible if he agreed to testify. In a second 1993 version, District Attorney Larry Howard ("L. Howard") offered a deal to Tyson while he was in jail during his trial. Tyson discussed it with numerous other people and decided to testify against Williams. Finally, in live testimony during the 1990 evidentiary hearing, Tyson explained that he had not been contacted by the District Attorney about testifying, and in fact was surprised when a deputy arrived to pick him up from jail so that he could testify. In this version, Tyson was still set against testifying when he met L. Howard at the county courthouse, but Howard changed his mind by explaining that District Attorney's office could keep him in jail, or cooperate with parole. Even so, Tyson testified that L. Howard said, "I can't promise you nothing right now." EH 9/24/90 at 8–9.[8]

---

**8.** This version is the most consistent with L. Howard's testimony and is probably the closest to the truth. Howard testified that he had no contact with Tyson prior to bringing him to Merced, and had only a short conversation after doing so, during which he made no "solid promises."

In light of this conflicting testimony, Tyson's concession at the evidentiary hearing that L. Howard refused to make any promises, and L. Howard's own testimony that he made no promises, the district court was entitled to conclude that no parole-related promises were made. Consequently, even if Tyson was motivated to testify by his subjective belief that it might improve his chances of parole, as it seems clear he was, his testimony that he had been made "no promises" was not perjurious.

**B**

In addition, a second deal allegedly existed in which the District Attorney would agree not to seek the death penalty in return for Tyson's cooperation. L. Howard testified to the following conversation occurring while Tyson was leading Howard and several detectives to Meza's body on October 13:

Q: Okay. So with regard to the death penalty then that Mr. Tyson was concerned about what was said, if anything, for example, by you, first of all, to Mr. Tyson with regard to the death penalty?

A: The only thing that I recall telling Tyson was that I told him that he was— asked him, really, if he was willing to testify. And he was very blunt. He said, "Sure, I'll do anything." And I said, "Is what you have told the investigators the truth?" And he said, "Yes." And I said, "Do you understand that we have to do some investigating and check out what you're saying to us? But if what you're saying is corroborated by what we find out, then we'll not seek the death penalty."

. . . . .

Q: And you indicated that if [his story] checked out and so forth and that he continued to cooperate, that you wouldn't be seeking the death penalty, correct?

A: We told him that.

L. Howard 9/17/90 Deposition at 9–11.

This testimony is ambiguous; it might or might not indicate a promise by the District Attorney not to seek the death penalty in return for a promise by Tyson to testify. L. Howard never explicitly made seeking that penalty contingent on Tyson testifying. L.

Howard's own interpretations are conflicting. In the same deposition, he denied that any deal was made limiting Tyson's sentence in return for testimony. However, according to a parole board investigator, in 1987 "Howard recollected that Tyson agreed to testify in court against Williams, if the District Attorney's Office would not seek the death penalty in his trial." 1987 Parole Board Report of Investigation at 1.

Added to this ambiguity is the fact that out of all the testimony and declarations of Tyson, in not one does he ever mention any "testimony for no death penalty" deal. The one note of consistency in his story is that he was motivated to testify because he believed it would increase his chances of parole. The only other evidence of any such deal is the 1993 declaration of Nick Groen, who alleges that when he visited Tyson shortly after his arrest 14 years earlier, Tyson told him he'd been offered "no death penalty" *and* help with parole.

Whatever may have transpired on October 13, it appears that Tyson did not perceive that he had been promised no death penalty for his testimony. The district court's conclusion that no deals were struck was therefore a permissible one in light of the evidence. We cannot say that Tyson's testimony to the contrary was perjury. Consequently, we need not determine whether " 'there is any reasonable likelihood that the false testimony could have [a]ffected the judgment of the jury.' " *United States v. Young,* 17 F.3d 1201, 1203 (9th Cir.1994) (quoting *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976)).

**VI**

█ Williams argues that the state trial court erroneously failed to instruct on an element of the kidnapping special circumstance, that the jury's finding this circumstance true was therefore invalid, and that this error is not subject to harmless error review. We agree that instructional error occurred, but it does not require reversal.

California's 1977 death penalty statute uses special circumstances to narrow the

death-eligible class. Cal.Penal Code § 190.2. Only once one or more special circumstances have been found will a separate penalty-phase trial occur. At that stage, jurors are provided a new list of factors which they can "consider, take into account, and be guided by." Cal.Penal Code § 190.3. The special circumstances used to determine death-eligibility are included as part of one factor the jury may consider. Cal.Penal Code § 190.3(a).

Both the California Supreme Court and the district court properly found or assumed error in the kidnapping special circumstance instructions. *Williams,* 44 Cal.3d at 928–29, 245 Cal.Rptr. 336, 751 P.2d 395; *Williams,* 817 F.Supp. at 1482–83. Under California law, it is not enough that murder happen during a kidnapping, or vice-versa; for the felony-murder special circumstance to be satisfied, the murder must be intended to advance an independent felonious purpose. *People v. Green,* 27 Cal.3d 1, 59–63, 164 Cal.Rptr. 1, 609 P.2d 468 (1980). Moreover, as the California Supreme Court explained in *Green,* it added this element out of constitutional necessity, not mere state law nicety, for without this narrowing construction, the special circumstance would run afoul of the requirements of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) that states provide a rational basis for distinguishing between those who deserve to be considered for the death penalty and those who do not. *Green,* 27 Cal.3d at 61, 164 Cal.Rptr. 1, 609 P.2d 468. In part because *Green* was decided one year after Williams' trial, the special circumstance instructions failed to require a finding of this element.

Williams suggests that *Sullivan v. Louisiana,* —— U.S. ——, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) bars harmless error review of this omission. *Sullivan* does no such thing. Errors generally fall into two categories: 1) structural error, affecting the fundamental nature of how trial was conducted or a conviction reached, which requires per se reversal, and 2) trial error, which is subject to harmless error review. *Arizona v. Fulminante,* 499 U.S. 279, 307–10, 111 S.Ct. 1246, 1263–65, 113 L.Ed.2d 302 (1991). *Sullivan* holds only that failure to properly instruct on the "beyond a reasonable doubt" standard for finding guilt constitutes structural error. *Sullivan,* —— U.S. at ——, 113 S.Ct. at 2082–83. In contrast, error in the instructions on a death penalty special circumstance is trial error susceptible of harmless error review. *See Wade v. Calderon,* 29 F.3d 1312, 1322 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 923, 130 L.Ed.2d 802 (1995). Williams is not entitled to relief unless "the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). The error must result in "actual prejudice." *Id.*

Where the error involves a failure to provide a narrowing instruction on a death special circumstance, we begin by asking whether it can be concluded, in light of the other instructions, that the jury necessarily found the omitted narrowing element. *Wade,* 29 F.3d at 1322. Here, the instructional error meant that the jury could find the kidnapping-murder special circumstance based solely on the fact that the murder occurred during a kidnapping, without finding that the killing was intended to further the kidnapping.

The district court concluded that the jury necessarily found this element anyway. *Williams,* 817 F.Supp. at 1483–84. In its view, finding that Williams kidnapped Meza entailed a finding that Williams' reason for doing so was to rape her, and that his reason for killing her was to then silence her. This is one plausible explanation for Williams' actions. It is by no means the only one.[9] Nothing in the jury instructions required the jury to reach these conclusions in order to find the kidnapping special circumstance true. So long as Meza's killing occurred during an asportation by force, the jury instruction's definition of the circumstance was

---

9. For instance, in his taped confession, Williams said that he wanted to shoot Meza at the farm-house, but Tyson started to "freak[] out," so they took her with them.

met. Therefore, the instructional error cannot be considered harmless on the theory that the jury necessarily found the omitted element.

The state court took a slightly different tack, concluding that because the evidence against Williams was so overwhelming, no rational, properly instructed jury could have failed to find the omitted element. *Williams*, 44 Cal.3d at 928–29, 245 Cal.Rptr. 336, 751 P.2d 395. Consequently, Williams suffered no prejudice. This analysis mistakenly focuses on a hypothetical jury, when the role of the reviewing court in conducting harmless error analysis is "to consider ... not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the ... verdict in the case at hand." *Sullivan*, — U.S. at —, 113 S.Ct. at 2081; *Wade*, 29 F.3d at 1322 ("the question is *not* 'were they [the jurors] right in their judgment, regardless of the error or its effect on the verdict.'") (quoting *Brecht*, — U.S. at —, 113 S.Ct. at 1724 (Stevens, J., concurring)).

· Because the instructional omission cannot be cured in either of these fashions, we must determine what effect consideration of this "invalid" aggravating factor may have had on the jury's verdict. Under the Supreme Court's doctrinal framework, what approach applies turns on whether California was a "weighing state" in 1977. *See Stringer v. Black*, 503 U.S. 222, 229–32, 112 S.Ct. 1130, 1136–37, 117 L.Ed.2d 367 (1992); *Clemons v. Mississippi*, 494 U.S. 738, 744–50, 110 S.Ct. 1441, 1445–49, 108 L.Ed.2d 725 (1990); *Zant v. Stephens*, 462 U.S. 862, 890, 103 S.Ct. 2733, 2749–50, 77 L.Ed.2d 235 (1983). The only effect an invalid aggravating factor has in a non-weighing state is that otherwise admissible evidence receives the label "aggravating factor." *Id.* at 888, 103 S.Ct. at 2748. In weighing states, by contrast, "when the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale." *Stringer*, 503 U.S. at 232, 112 S.Ct. at 1137. Because of this, in nonweighing states reviewing courts may affirm

so long as other aggravating factors remain, while in weighing states reviewing courts must conduct constitutional harmless-error analysis or a reweighing. *Clemons*, 494 U.S. at 744–45, 110 S.Ct. at 1445–47; *Stringer*, 503 U.S. at 230–32, 112 S.Ct. at 1137.

Williams assumes without argument that California is a weighing state, and that the Supreme Court's weighing state precedents therefore apply. We disagree with this assumption. Undoubtedly California's current death penalty scheme, passed in 1978, creates a weighing state regime, but the 1977 law under which Williams was sentenced was critically different.

The Supreme Court's weighing/non-weighing distinction does not turn simply on whether or not the word "weighing" appears in a state's statute. *See, e.g., Richmond v. Lewis*, — U.S. —, — – —, 113 S.Ct. 528, 534–35, 121 L.Ed.2d 411 (1992) (holding that Arizona is a weighing state despite the absence of the term). Instead, the distinction can be understood functionally in one of two ways. First, when a jury "is specifically instructed to weigh statutory aggravating and mitigating circumstances," *Zant*, 462 U.S. at 890, 103 S.Ct. at 2750, and its decision is tied to the outcome, the decisional process necessarily becomes infected by the improper consideration. In states where no such procedure is mandated, the factor need not infect the process; the jury is under no obligation to weigh the factor as part of its calculus. Second, when a jury is limited to the consideration of discrete aggravating factors, consideration of an invalid factor may allow consideration of something—the circumstances supporting the factor—that could not have otherwise been considered. In contrast, when a jury is permitted to consider any evidence it deems relevant in aggravation, the consideration of an invalid factor adds only an improper label—the state's "aggravating factor" imprimatur—to underlying circumstances which could have been taken into account anyway. *Id.* at 886–88, 103 S.Ct. at 2747–49.

Consequently, the Supreme Court's weighing/non-weighing distinction may involve both procedural and substantive compo-

nents.[10] Procedurally, is the sentencer restricted to a "weighing" of aggravation against mitigation? Substantively, is the sentencer prevented from considering evidence in aggravation other than discrete, statutorily-defined factors? Our review of federal and state court decisions reveals that where both constraints are present, the regimes involved are uniformly treated as weighing[11]; where neither is present, the regimes are uniformly treated as non-weighing[12]; and where one but not the other is present, disagreement has arisen.[13]

We need not deal with that disagreement or decide any further whether procedural or substantive constraints lie closer to the core of the distinction, because the statute we are faced with involves neither constraint. As the California Supreme Court explained in

**10.** As a further reflection of this possible dual interpretation, the Supreme Court has described a weighing state as a state in which "the death penalty may be imposed only where specified aggravating circumstances outweigh all mitigating circumstances." *Parker v. Dugger,* 498 U.S. 308, 318, 111 S.Ct. 731, 738, 112 L.Ed.2d 812 (1991). The central test may be that 1) weighing is required, 2) only "specified aggravating circumstances" are considered, or both.

**11.** *See, e.g., Lawhorn v. State,* 581 So.2d 1159, 1176 (Ala.Crim.App.1990) (Ala.Code §§ 13A–5–46 to –49 (1994)), *aff'd, Ex parte Lawhorn,* 581 So.2d 1179 (Ala.1991); *Richmond v. Lewis,* ——— U.S. ———, ——— – ———, 113 S.Ct. 528, 534–35, 121 L.Ed.2d 411 (1992) (Ariz.Rev.Stat.Ann. § 13–703 (1994)); *Ford v. Lockhart,* 861 F.Supp. 1447, 1453 (E.D.Ark.1994) (Ark.Code Ann. §§ 5–4–602 to –604 (1994)); *People v. White,* 870 P.2d 424, 447–49 (Colo.) (Colo.Rev.Stat. § 16–11–103 (1994)), *cert. denied,* ——— U.S. ———, 115 S.Ct. 127, 130 L.Ed.2d 71 (1994); *Parker v. Dugger,* 498 U.S. 308, 318, 111 S.Ct. 731, 737–38, 112 L.Ed.2d 812 (1991) (Fla.Stat.Ann. § 921.141 (West 1995)); *Bellmore v. State,* 602 N.E.2d 111, 129–30 (Ind.1992) (Ind.Code Ann. § 35–50–2–9 (West 1994)); *Stringer v. Black,* 503 U.S. 222, 229–30, 112 S.Ct. 1130, 1136, 117 L.Ed.2d 367 (1992) (Miss.Code Ann. § 99–19–101 (1993)); *State v. Reeves,* 239 Neb. 419, 476 N.W.2d 829, 836 (1991) (Neb.Rev.Stat. §§ 29–2522 to 29–2523 (1993)), *cert. denied,* ——— U.S. ———, 113 S.Ct. 114, 121 L.Ed.2d 71 (1992); *Canape v. State,* 109 Nev. 864, 859 P.2d 1023, 1031–35 (1993) (Nev.Rev.Stat. §§ 200.030, 200.033 (1993)), *cert. denied,* ——— U.S. ———, 115 S.Ct. 176, 130 L.Ed.2d 112 (1994); *State v. Henderson,* 109 N.M. 655, 789 P.2d 603, 609–10 (1990) (N.M.Stat.Ann. §§ 31–20A–2, 31–20A–5 (1994)); *Smith v. Dixon,* 14 F.3d 956, 974 (4th Cir.) (en banc) (N.C.Gen.Stat. § 15A–2000 (1994)), *cert. denied,* ——— U.S. ———, 115 S.Ct. 129, 130 L.Ed.2d 72 (1994); *State v. Davis,* 38 Ohio St.3d 361, 528 N.E.2d 925, 933 n. 11 (1988) (Ohio Rev.Code Ann. §§ 2929.03–.04 (Anderson 1993)), *cert. denied,* 488 U.S. 1034, 109 S.Ct. 849, 102 L.Ed.2d 980 (1989); *Stafford v. Saffle,* 34 F.3d 1557, 1568 (10th Cir.1994) (Okla.Stat.Ann. §§ 701.10–.12 (West 1995)), *petition for cert. filed,* Mar. 10, 1995; *Commonwealth v. Holcomb,* 508 Pa. 425, 498 A.2d 833, 849–51 & n. 16 (1985) (42 Pa. Cons.Stat.Ann. § 9711 (1994)), *cert. denied,* 475 U.S. 1150, 106 S.Ct. 1804, 90 L.Ed.2d 349 (1986); *State v. Howell,* 868 S.W.2d 238, 259–62

(Tenn.1993) (Tenn.Code Ann. § 39–13–204 (1994)), *cert. denied,* ——— U.S. ———, 114 S.Ct. 1339, 127 L.Ed.2d 687 (1994); *State v. Archuleta,* 850 P.2d 1232, 1247–48 (Utah) (Utah Code Ann. §§ 76–3–207, 76–5–202 (1994), as interpreted by *State v. Pierre,* 572 P.2d 1338, 1347–48 (Utah 1977)), *cert. denied,* ——— U.S. ———, 114 S.Ct. 476, 126 L.Ed.2d 427 (1993); *Zant v. Stephens,* 462 U.S. 862, 874 n. 12, 103 S.Ct. 2733, 2741 n. 12, 77 L.Ed.2d 235 (1983) (Wyo.Stat. § 6–2–102 (1988), as interpreted by *Hopkinson v. State,* 632 P.2d 79, 171 (Wyo.1981), *cert. denied,* 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982)).

**12.** *See, e.g., Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (Ga.Code Ann. § 17–10–30 (Michie 1994)); *People v. Todd,* 154 Ill.2d 57, 180 Ill.Dec. 676, 684–85, 607 N.E.2d 1189, 1197–98 (1992) (720 Ill.Comp.Stat.Ann. § 5/9–1 (1994)), *cert. denied,* ——— U.S. ———, 114 S.Ct. 381, 126 L.Ed.2d 331 (1993); *Wilson v. Commonwealth,* 836 S.W.2d 872, 891 (Ky.1992) (Ky.Rev.Stat.Ann. § 532.025 (Michie/Bobbs-Merrill 1994)), *cert. denied,* ——— U.S. ———, 113 S.Ct. 1857, 123 L.Ed.2d 479 (1993); *Ward v. Whitley,* 21 F.3d 1355, 1365 (5th Cir.1994) (La.Code Crim.Proc.Ann. art. 905.3–.4 (West 1994)), *cert. denied,* ——— U.S. ———, 115 S.Ct. 1257, 131 L.Ed.2d 137 (1995); *Briley v. Bass,* 742 F.2d 155, 166 (4th Cir.) (Va.Code Ann. §§ 19.2–264.2, 19.2–264.4 (Michie 1994)), *cert. denied,* 469 U.S. 893, 105 S.Ct. 270, 83 L.Ed.2d 206 (1984).

**13.** For instance, Delaware, Idaho and Missouri have regimes which require weighing but do not limit consideration to statutory aggravating factors. *See* Del.Code Ann. tit. 11, § 4209 (1994); Idaho Code § 19–2515 (1994) (as interpreted by *State v. Creech,* 105 Idaho 362, 670 P.2d 463, 470–71 (1983), *cert. denied,* 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 722 (1984)); Mo.Ann. Stat. §§ 565.030, 565.032 (Vernon 1994). Idaho has been treated as a weighing state because of the explicit procedural constraint, while Delaware and Missouri have been treated as non-weighing states in light of the absence of substantive constraints. *See Beam v. Paskett,* 3 F.3d 1301, 1311 (9th Cir.1993), *cert. denied sub nom. Arave v. Beam,* ——— U.S. ———, 114 S.Ct. 1631, 128 L.Ed.2d 354 (1994); *State v. LaRette,* 648 S.W.2d 96, 102 (Mo.), *cert. denied,* 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983); *Bailey v. Snyder,* 855 F.Supp. 1392, 1408–10 (D.Del.1993).

discussing the change from the 1977 to the 1978 law,

> The 1978 initiative, however, enacted a crucial change in the method by which the jury determines whether to impose the death penalty.... Under the 1977 version of section 190.3, the jury must 'consider, take into account and be guided by the aggravating and mitigating circumstances' enumerated in the section. The statute, however, provided no further guidance or limitation on the jury's sentencing discretion. In the absence of such a limitation, the jury was free, after considering the listed aggravating and mitigating factors, to consider any other matter it thought relevant to the penalty determination. The 1978 initiative, by contrast, provided specifically that the jury 'shall impose a sentence of death if [it] concludes that the aggravating circumstances outweigh the mitigating circumstances. If [it] determines that the mitigating circumstances outweigh the aggravating circumstances [it] shall impose a sentence of confinement in state prison for a term of life without the possibility of parole.' By thus requiring the jury to decide the appropriateness of the death penalty by a process of weighing the specific factors listed in the statute, the initiative necessarily implied that the matters not within the statutory list are not entitled to any weight in the penalty determination.

*People v. Boyd,* 38 Cal.3d 762, 773, 215 Cal. Rptr. 1, 700 P.2d 782 (1985) (citations omitted). Thus, it was not until 1978 that California required a weighing of statutory and mitigating factors.[14] Equally important, the statute placed no limits on what the jury could consider at the sentencing phase; not until 1978 were juries restricted to consider-ing only the discrete factors listed in § 190.3. *Compare People v. Murtishaw,* 29 Cal.3d 733, 773, 175 Cal.Rptr. 738, 631 P.2d 446 (1981) (allowing jury under 1977 law to consider evidence not tied to any statutory factor), *cert. denied,* 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 464 (1982), *with Boyd,* 38 Cal.3d at 773–74, 215 Cal.Rptr. 1, 700 P.2d 782 (reaching opposite conclusion under 1978 law). Williams' jury was properly instructed in accordance with these interpretations; the trial court explained,

> Now, ladies and gentlemen, if during the course of the argument you thought you heard a comment about the law as being that it says that you shall impose a sentence of death if you conclude that the aggravating circumstances outweigh the mitigating circumstances, or you shall impose mitigating—excuse me, life imprisonment without possibility of parole if you feel that the mitigating circumstances outweigh the aggravating circumstances, I tell you that's not the law that applies to the case.
>
> You may use those. As the way in which you go about this. But the way you go about this is up to you. And the law does not say you shall do one or the other.

RT 4/11/79 at 1614.

Consequently, because neither of the previously-identified constraints were placed on the sentencing-phase decisionmaking, we can safely say that the 1977 California death penalty law created a nonweighing regime. As such, it is governed by the rule of *Zant* that invalidation of one aggravating circumstance does not require reversal so long as other aggravating circumstances remain. *Zant,* 462 U.S. at 884, 103 S.Ct. at 2746–47. Williams' jury found several other valid spe-

---

14. Six years earlier, the California Supreme Court described the 1977's law's guidance provision as "essentially equivalent to the provision in the valid Florida statute requiring the sentencing authority to 'weigh' those factors in reaching its decision." *People v. Frierson,* 25 Cal.3d 142, 180, 158 Cal.Rptr. 281, 599 P.2d 587 (1979). Reading this language in context, however, we do not find it at all at odds with *Boyd*'s later explanation of the statute. *Frierson* does not interpret the statute as requiring weighing; it concludes, rather, that the statute provides a level of guidance comparable to that of Florida,

and therefore, "the 1977 death penalty law is not constitutionally vulnerable because of its failure to provide a different method of proving or weighing the relevant statutory considerations specified therein." *Id. Frierson* thus does not dispute that the 1977 law "fail[s] to provide" for weighing. *See also id.* at 192 & n. 6, 158 Cal. Rptr. 281, 599 P.2d 587 (Mosk, J., concurring) (noting that "our statute does not require the sentencing authority to expressly find ... that the aggravating circumstances in fact outweigh the mitigating circumstances," a requirement only added in 1978).

cial circumstances. Even with a correct, or no, kidnapping special circumstance instruction, the jury could still have considered Meza's kidnapping in making its decision. We conclude that in light of the remainder of the instructions and evidence in this case, the slight impact from placing the label "special circumstance" on an otherwise admissible consideration "cannot fairly be regarded as a constitutional defect in the sentencing process." *Id.* at 889, 103 S.Ct. at 2749. Williams has thus suffered no "actual prejudice" as a result of any *Green* error. *Brecht,* ⸺ U.S. at ⸺, 113 S.Ct. at 1722.

## VII

■■■ Williams suggests that the penalty-phase jury instructions in his case failed to adequately guide the jury and ensure individualized sentencing in accordance with *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Having considered the jury instructions in their entirety, we conclude that they were fully consistent with the mandate of *Gregg.*

## A

Williams argues that he was improperly charged with more than one multiple-murder special circumstance. The jury was instructed on, and found true, six multiple murder special circumstances, two each for each of the three murders. At the penalty phase, they were permitted to consider any special circumstances found true. The state concedes, and the California Supreme Court found, that this overcharging was error. *Williams,* 44 Cal.3d at 950, 245 Cal.Rptr. 336, 751 P.2d 395. Instead, the jury should have been instructed on one multiple murder special circumstance. However, we have previously rejected the possibility that such an error could be material, concluding that "[i]t is highly unlikely that the jury simply counted up the special circumstances charged and based the verdict on such calculation. We cannot reverse on the basis of speculation of that nature." *Harris v. Pulley,* 692 F.2d 1189, 1203 (9th Cir.1982), *rev'd in part*

*on other grounds,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

Williams argues that *Richmond v. Lewis,* ⸺ U.S. ⸺, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992) and *Stringer v. Black,* 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992) supersede *Harris*'s conclusion by holding that courts may not presume the consideration of improper factors did not affect a jury's weighing. However, as we explained above, California in 1977 was not a weighing state. These later weighing state cases are inapposite. We therefore reject Williams' suggestion that anything in *Stringer* or *Richmond* frees us to disregard *Harris.*

Even if this were not so, Williams would be entitled to no relief for a second reason. As we have previously discussed, after *Richmond, Stringer,* and *Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), state courts in weighing states may still cure the consideration of improper factors in sentencing either by weighing or by conducting constitutional harmless-error review. *Stringer,* 503 U.S. at 230–32, 112 S.Ct. at 1137. Here, California chose the latter course. The state Supreme Court considered the error in light of the entire record and concluded that there was "no possibility" the error had affected the verdict. *Williams,* 44 Cal.3d at 950–51, 245 Cal.Rptr. 336, 751 P.2d 395. This review and conclusion satisfy the requirements for constitutional harmless-error analysis. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) (requiring that error be harmless "beyond reasonable doubt").

## B

■■■ Next, Williams argues that the trial court failed to instruct the jury that with regard to factor § 190.3(b),[15] it could consider any criminal activity only if proved beyond a reasonable doubt, as required by *People v. Robertson,* 33 Cal.3d 21, 188 Cal.Rptr. 77, 655 P.2d 279 (1982). *Robertson* error is state law error, not cognizable on federal habeas. *Estelle v. McGuire,* 502 U.S. 62, 67–69, 112

15. Cal.Penal Code § 190.3(b) directs consideration of "[t]he presence or absence of criminal activity by the defendant which involved the use

or attempted use of force or violence or the express or implied threat to use force or violence."

S.Ct. 475, 480, 116 L.Ed.2d 385 (1992). Moreover, the state court found no *Robertson* error, *Williams,* 44 Cal.3d at 958–59, 245 Cal.Rptr. 336, 751 P.2d 395, a conclusion binding on us. Therefore, *Fetterly v. Paskett,* 997 F.2d 1295 (9th Cir.1993), which holds that a state's failure to follow its own death penalty procedures can in some cases raise a federal issue, is inapposite: here there was no state failure. Nor is § 190.3(b) void for vagueness, as Williams also contends. *See Pulley v. Harris,* 465 U.S. 37, 51–54, 104 S.Ct. 871, 879–81, 79 L.Ed.2d 29 (1984).

**C**

 Next, Williams argues that it was error to read to the jury the entire list of factors the state considered relevant to the sentencing decision, even when some did not apply. To the contrary, the jury instructions expressly indicated that the jury was to consider each factor only "if applicable." Moreover, "[i]t seems clear ... that the problem [of jury inexperience] will be alleviated if the jury is given guidance regarding the factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision." *Gregg v. Georgia,* 428 U.S. 153, 192, 96 S.Ct. 2909, 2934, 49 L.Ed.2d 859 (1976) (plurality opinion). The reading of the complete list gave the jury more guidance, not less. We find nothing in the Constitution prohibiting the very practice *Gregg* encouraged.

**D**

 Next, Williams objects to the giving of a "no sympathy" instruction during the guilt phase.[16] He argues that this instruction necessarily constricted the jury's interpretation of the penalty phase instruction allowing consideration of any extenuating cir-

cumstances.[17] To the contrary, "no sympathy" instructions have been held by the Supreme Court to be consistent with its mandate in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) that the sentencer be permitted to consider all mitigating evidence. *California v. Brown,* 479 U.S. 538, 541, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987).[18]

We are not persuaded by Williams' suggestion that *People v. Easley,* 34 Cal.3d 858, 196 Cal.Rptr. 309, 671 P.2d 813 (1983), should dictate a different result because it considers the interplay between the "no sympathy" instruction and the "extenuating circumstances" instruction. The holding of *Easley* is simply that, regardless of any effect of the latter instruction, the "no sympathy" instruction violates the Eighth Amendment. *Id.* at 878–79, 196 Cal.Rptr. 309, 671 P.2d 813. This conclusion was expressly rejected by the Supreme Court in *Brown.* We agree with the conclusion of the California Supreme Court that the giving of a no sympathy instruction during the guilt phase did not result in the jury being misinformed about its responsibility to consider all mitigating evidence. *See Brown,* 479 U.S. at 546, 107 S.Ct. at 841–42 (O'Connor, J., concurring).

**E**

 Fifth, Williams argues that a short curative instruction by the trial judge left the jury adrift to consider nonstatutory aggravating factors without any guidance. The full text of the instruction, quoted in § VI, makes clear no error occurred. After reading the list of potentially relevant statutory factors, the court explained that, contrary to an earlier prosecutorial argument, the jury was not required to weigh aggravating and mitigating factors, and was not under obligation to find

**16.** The instructions read, "In performing this duty [deciding the facts] you must not be influenced by pity for a defendant or by passion or prejudice against him." RT 4/5/79 at 1402. The jury was further instructed that they "must not be governed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling" during their sentencing deliberations. RT 4/5/79 at 1402.

**17.** This instruction asked the jury to consider, if applicable, "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." RT 4/11/79 at 1614.

**18.** The "no sympathy" instruction at issue was identical to the one given in this case, although the additional "no pity" instruction was not at issue. *Brown,* 479 U.S. at 539, 107 S.Ct. at 838.

for life or death based on which factors predominated. Such an instruction violates no right of Williams. "A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." *Tuilaepa v. California*, —— U.S. ——, ——, 114 S.Ct. 2630, 2638, 129 L.Ed.2d 750 (1994).

### F

Finally, Williams suggests that several prosecutorial comments deprived him of constitutional rights. Because none of the comments were objected to contemporaneously, we review only for plain error, error that is highly prejudicial and affects substantial rights. *United States v. Dischner*, 974 F.2d 1502, 1515 (9th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1290, 122 L.Ed.2d 682 (1993).

■■■ Williams finds error in three comments. First, the prosecutor listed each § 190.3 factor. Again, we find no error in identifying for the jury the spectrum of factors the state considers relevant to the sentencing decision. Second, describing one of the factors (victim participation), the prosecutor said, "I don't mean to insult your intelligence, but its a factor, it's either an aggravating or a mitigating factor." The prosecutor then went on to argue how victim participation or consent was absent in this case. This did not require the jury to construe the absence of a mitigating factor as an aggravating factor, rather than simply a mitigating factor not present. In any event, the jury was instructed to only consider each factor "if applicable." Finally, the prosecutor asked the jury, "How do you add these up?" and argued that it "shall" impose death if the aggravating factors outweighed the mitigating circumstances. Any error here was cured by the instruction given by the trial court quoted above, which made clear that the jury was neither required to weigh nor

stripped of discretion over what consequences should follow from any weighing it did.[19]

### VIII

Williams contends that the state trial court considered numerous improper factors in declining to modify Williams' sentence. All factors considered were either permissible or harmless error.

■■■ During California's penalty phase, "evidence presented at any prior phase of the trial" may be considered. Cal.Penal Code § 190.4(d). Under the 1977 statute, while the jury was to consider and be guided by the factors listed in § 190.3, it thereafter could "consider any other matter it thought relevant to the penalty determination." *People v. Boyd*, 38 Cal.3d 762, 773, 215 Cal.Rptr. 1, 700 P.2d 782 (1985); *accord Harris*, 692 F.2d at 1194. After the jury reached a sentence of death, the trial judge was required to "review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and ... make an independent determination as to whether the weight of the evidence supports the jury's findings and verdict." Cal.Penal Code § 190.4(e).

Williams offers a litany of factors he believes the trial judge impermissibly considered in denying modification of his sentence. None of these considerations is reversible error. In reviewing the motion for modification, the trial judge worked through each of the statutory factors. The judge considered the fact that Meza was required to submit to sex, but this was not error both because evidence certainly supported this conclusion, and because the jury's finding the rape special circumstance untrue did not mean they found she had not been raped.[20] The judge's consideration of Williams' commitment to the Youth Authority was error, as the state con-

---

19. To the extent Williams means to also incorporate by reference the other claims he made before the district court regarding improper prosecutorial comment, these other claims were properly rejected for the reasons stated in the district court's opinion. *Williams*, 817 F.Supp. at 1488–90.

20. As the California Supreme Court correctly noted, they could have found the rape was not sufficiently contemporaneous with the murder, as the jury instruction seemed to require. *Williams*, 44 Cal.3d at 929, 245 Cal.Rptr. 336, 751 P.2d 395. Consequently, nothing in the jury's findings foreclosed consideration of a possible rape.

cedes, but it was harmless; in light of the numerous other considerations mentioned in his four-page ruling, the judge surely would have ruled the same way without considering it. The judge considered the shots Williams fired during the camper incident; again, even if this was error, it would not have affected his ruling. Williams' trial demeanor was evidence the jury and judge could both consider, *United States v. Schuler*, 813 F.2d 978, 981 n. 3 (9th Cir.1987), and as noted above, the 1977 statute does not limit consideration in reviewing the evidence to just the statutory aggravating factors. The judge's consideration of the victim's consent (or not) and any justification (or not) for the crime was directly authorized by statute. Cal.Penal Code §§ 190.3(d)–(e). The judge considered Williams' dislike of Mexicans as an explanation for the killings; Williams admitted on the stand that "I don't like Mexicans, period." RT 4/4/79 at 1320. Finally, contrary to Williams' contentions, the trial judge expressly indicated that he had considered all evidence received during the trial. This necessarily includes the mitigating evidence of diminished capacity Williams presented.

Williams suggests that the trial judge in effect considered several invalid aggravating factors, requiring reweighing under *Stringer* and *Richmond*. To the contrary, the 1977 death penalty statute allows consideration of nonstatutory factors. *Harris*, 692 F.2d at 1194. This the judge did. We find no error.

### IX

Next, Williams challenges three aspects of the district court proceedings: the form of the answer filed by respondent, the delay in deciding Williams' case, and the refusal of the district court to grant a broader evidentiary hearing. We find no error.

### A

Williams challenges the adequacy of respondent Calderon's answer to his habeas petition, contending that because that answer failed to comply with Rule 5 of the Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254, the answer should be stricken and this case returned to the district court for the filing of a new answer. We disagree with both Williams' premise and his conclusion.

When an answer to a petition is ordered pursuant to Rule 4, Rule 5 requires "[t]he answer [to] respond to the allegations of the petition." The purpose of the answer is to frame the issues in dispute, as well as to ferret out unmeritorious petitions. *See* Advisory Committee Notes to Rule 5. Neither Rule 5, nor the Advisory Notes, nor subsequent case law set out any further restrictions on the form of the answer, unlike Federal Rules of Civil Procedure 8(b) and 8(d), which require fact-by-fact responses.

Nothing about Calderon's answer violated Rule 5. The answer responded to the petition on the merits, laying out the state's alternative view of the facts and the law. Nothing in Rule 5 prohibits the form used to frame the legal and factual issues. Moreover, to the extent that the answer failed to adequately frame the issues for the district court, any harm became irrelevant once the district court issued a final decision. If Williams has a grievance, it must be with that decision, not the filings that preceded it.

### B

Williams next argues that the 26–month delay before the district court finally denied his petition violated his due process rights. We disagree.

Williams relies on *Carter v. Thomas*, 527 F.2d 1332 (5th Cir.1976) for the proposition that long delays in habeas processing may violate due process. We have never decided to follow *Carter, see Satterlee v. Kritzman*, 626 F.2d 682, 683 (9th Cir.1980), and in any event, *Carter* holds only that constitutional immunity should not be extended to "extreme and unreasonable delays." *Carter*, 527 F.2d at 1333. We need not take this occasion to decide whether a *Carter* claim could exist in this circuit. In light of the magnitude of Williams' petition and the mortal interests at stake, the district court's delay in this case was neither extreme nor unreasonable. In addition, Williams has offered no evidence that the delay was discriminatory or purposeful. *See Prantil v. California*, 843 F.2d

314, 319 (9th Cir.), *cert. denied,* 488 U.S. 861, 109 S.Ct. 158, 102 L.Ed.2d 129 (1988).

## C

Williams suggests that on at least seven claims, the district court erred in declining to provide an evidentiary hearing. Williams has not established that he was entitled to a hearing on any of these claims.

 "A habeas petitioner is entitled to an evidentiary hearing on a claim if '(1) the petitioner's allegations, if proved, would entitle him to relief, and (2) the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts.'" *Hendricks v. Vasquez,* 974 F.2d 1099, 1103 (9th Cir.1992). No hearing is required if "there are no disputed facts and the claim presents a purely legal question." *Id.* Williams seeks a hearing on his claims of ineffective assistance, deprivation of psychiatric assistance and dual appointment of psychiatrists, counsel conflict of interest, denial of change of venue and meaningful voir dire, and failure to request an accomplice instruction.

Williams' counsel contended vigorously at oral argument that, at the least, he should receive an evidentiary hearing on his ineffective assistance of counsel claim in light of *Hendricks* and *Siripongs v. Calderon,* 35 F.3d 1308 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1175, 130 L.Ed.2d 1127 (1995). We are not persuaded. The district court denied Williams a hearing, presumably because it concluded that, even taking all Williams' allegations of cause as true, Williams could still not establish prejudice. We agree.

Williams contends that the district court could only deny an evidentiary hearing if it made a credibility determination that Williams' experts, who said he was suffering from diminished capacity, were not worthy of belief. However, in reviewing Williams' *Strickland* claim, we must ask, not whether Williams suffered from diminished capacity, but instead whether, taking the experts' testimony as true, introduction of the testimony of one of them 15 years ago might have made a difference. That latter question requires no credibility determinations, and it is that

latter question which we answered firmly in the negative when we rejected the *Strickland* claim on the merits.

Nor do we find anything in *Siripongs* inconsistent with the denial of a hearing in this case. *Siripongs* does not establish a per se rule requiring an evidentiary hearing whenever a petitioner has made out a "colorable claim" of cause. It recognizes only that where such a claim has been made out, it is "generally likely" that a hearing will be required on the issue of prejudice. *Siripongs,* 35 F.3d at 1315; *accord Hendricks,* 974 F.2d at 1110. Here, in light of the evidence introduced at trial, we can and have concluded that there is no reasonable probability a different outcome would have resulted. Accordingly, because Williams failed to make out a "'colorable' claim of ineffective assistance," *id.* at 1314 (quoting *Smith v. McCormick,* 914 F.2d 1153, 1170 (9th Cir.1990)), he was properly denied a hearing.

Each of Williams' other six claims was also properly denied without a hearing. The district court could conclude, without resolving disputed facts not found by the state court, that no claim for relief was stated by any of the other claims for which Williams sought a hearing.

## X

Finally, Williams alleges four different ways in which the death penalty scheme in effect in California between 1977 and 1978 violated the Eighth and Fourteenth Amendments. Each of his contentions has previously been rejected by this court or the Supreme Court. We reaffirm these prior holdings.

The death penalty statute's failure to label aggravating and mitigating factors is constitutional. *Harris v. Pulley,* 692 F.2d 1189, 1194 (9th Cir.1982). The statute offers constitutionally-sufficient guidance to jurors to prevent arbitrary and capricious application. *Pulley v. Harris,* 465 U.S. 37, 51–54, 104 S.Ct. 871, 879–81, 79 L.Ed.2d 29 (1984). The statute ensures meaningful appellate review, *California v. Brown,* 479 U.S. 538, 543, 107 S.Ct. 837, 840, 93 L.Ed.2d 934 (1987), and need not require written jury findings in

order to be constitutional. *Harris*, 692 F.2d at 1195–96. Finally, the failure of the statute to require a specific finding that death is beyond a reasonable doubt the appropriate penalty does not render it unconstitutional. *Id.* at 1195.

## XI

Whether considered separately or together, the errors in Keith Daniel Williams' trial did not affect its outcome. Williams did not receive a perfect trial, but he did receive a fair one. He was entitled to no more. *Brown v. United States*, 411 U.S. 223, 231–32, 93 S.Ct. 1565, 1570–71, 36 L.Ed.2d 208 (1973). We affirm the district court's denial of the writ.

**AFFIRMED.**