**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| BRETT PATRICK PENSINGER, *Petitioner-Appellant*, <br><br> v. <br><br> KEVIN CHAPPELL, Warden, *Respondent-Appellee*. | No. 12-99006 <br><br> D.C. No. 2:92-cv-01928-DSF |
| BRETT PATRICK PENSINGER, *Petitioner-Appellee*, <br><br> v. <br><br> KEVIN CHAPPELL, Warden, *Respondent-Appellant*. | No. 13-99000 <br><br> D.C. No. 2:92-cv-01928-DSF <br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued October 9, 2014
Submitted June 2, 2015
Pasadena, California

Filed June 2, 2015

Before: Richard C. Tallman, Carlos T. Bea,
and John B. Owens, Circuit Judges.

Opinion by Judge Tallman

## SUMMARY[*]

### Habeas Corpus/Death Penalty

The panel affirmed the district court's partial grant and partial denial of California state prisoner Brett Pensinger's pre-AEDPA habeas corpus petition, upholding his kidnapping and first-degree murder conviction but overturning his sentence of death.

The panel rejected the State's request to invoke the panel's discretion to *sua sponte* apply the non-retroactivity bar under *Teague v. Lane*, 489 U.S. 288 (1989), which ordinarily prevents a federal court from granting habeas relief to a state prisoner based on a rule announced after his conviction and sentence became final, to bar Pensinger's instructional error claim.

The panel rejected the State's challenge to the district court's holding that the trial court violated Pensinger's constitutional rights by failing to instruct the jury *sua sponte* in accordance with *People v. Green*, 27 Cal. 3d 1 (1980), which held that a kidnap-murder special circumstance requires proof that the kidnapping was committed for an

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

independent felonious purpose (i.e., not merely incidental to the murder). The panel held that instructional error occurred, and that the error was not harmless.

The panel also rejected Pensinger's ineffective assistance of counsel claim based on his trial counsel's failure to request a *Green* instruction, where counsel's failure to request the instruction comported with the theory of his defense.

## COUNSEL

Jan B. Norman (argued), Los Angeles, California, for Petitioner-Appellant.

Lise S. Jacobson (argued) and Robin Urbanski, Deputy Attorneys General; Julie L. Garland, Senior Assistant Attorney General; Kamala D. Harris, Attorney General of California, San Diego, California, for Respondent-Appellee.

## OPINION

TALLMAN, Circuit Judge:

Brett Patrick Pensinger was convicted of kidnapping and first-degree murder and sentenced to death in 1982. After his California state appeals, Pensinger filed a writ of habeas corpus in federal court prior to the enactment of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. The district court granted in part and denied in part Pensinger's federal habeas petition, ultimately vacating the kidnap-murder special circumstance and the death sentence. Both

parties appealed. "[B]ecause in most matters it is more important that the applicable rule of law be settled than that it be settled right," we agree with the district court and uphold Pensinger's conviction for the kidnappings and murder but overturn his sentence of death. *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 406 (1932) (Brandeis, J., dissenting).

We reject the State's request that we invoke our discretion to *sua sponte* apply the non-retroactivity bar under *Teague v. Lane*, 489 U.S. 288 (1989), which ordinarily prevents a federal court from granting habeas relief to a state prisoner based on a rule announced after his conviction and sentence became final, to bar Pensinger's instructional error claim. We reject the State's challenge to the district court's holding that the trial court violated Pensinger's constitutional rights by failing to instruct the jury *sua sponte* in accordance with *People v. Green*, 27 Cal. 3d 1 (1980). *Green* held that a kidnap-murder special circumstance requires proof that the kidnapping was committed for an independent felonious purpose (i.e., not merely incidental to the murder). We also reject Pensinger's ineffective assistance of counsel claim based on his trial counsel's failure to request a *Green* instruction. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253, and we affirm the grant of partial habeas relief.

# I

## A

On August 4, 1981, 19-year-old Brett Pensinger met Vickie and Michael Melander, Sr., at the Silver Saddle Bar in Parker, Arizona, near the Colorado River separating Arizona from California. Pensinger drank and played pool with the Melanders, who had been drinking there since noon. At

about 7 p.m., Pensinger drove Vickie to a friend's home where she picked up her two children, five-year-old Michael, Jr., and five-month-old Michele. The four drove off in Pensinger's pickup truck around 7:40 p.m. toward the Turtle Barn Bar in Parker. Vickie and Pensinger went in for another drink, leaving the children unattended in the truck. While they were inside, Michael, Jr., found Pensinger's rifle inside his truck and pointed it at a passerby in the Turtle Barn parking lot, who confiscated it. When Vickie came out to check on the children, Michael, Jr., told her that a man had stolen Pensinger's gun.

Vickie testified that when she told Pensinger about the missing rifle he became so angry that she ran off down the street. Nonetheless, the four subsequently drove to the Silver Saddle, where Vickie again left the children unattended in the truck. She reported to her husband that she and Pensinger were going to the Yuma County Sheriff's substation to report the theft of the rifle. Vickie and Pensinger, still with the children in the truck, arrived at the sheriff's substation about 8:20 p.m. Vickie went into the station, expecting Pensinger to follow. While Vickie reported the theft, she looked out and noticed that the truck was gone, but assumed that Pensinger was either looking for his gun or was back at the Silver Saddle. Around 9 p.m., a Parker City police officer drove Vickie back to the Silver Saddle. Ten minutes after arriving Vickie realized that her children were still unaccounted for and called the police.

A customer and an employee of the P.D.Q. Market in Parker testified that a tall young man wearing a cowboy hat came into the store sometime between 8:45 and 9 p.m. on August 4th. Both witnesses said he was looking for someone who had stolen a rifle out of his truck while his wife and

five-year-old child were in it. He was reported to be beside himself with rage, and said that if the person who stole the gun came in and tried to use it in a robbery of the store, the store clerk had permission to use the gun to "blow their heads off." The store employee saw the man get into a light-colored pickup and drive off. The witness did not see anyone else in the truck.

Michael, Jr., confirmed his mother's testimony at trial. He further testified that he did not recall stopping at the P.D.Q. Market, but that after leaving the sheriff's substation and driving on a road outside of town Pensinger told him a cop was following him and that Michael, Jr., should get out and wait until Pensinger came back. Pensinger never returned. Later that night at about 9:30 p.m., a couple picked up Michael, Jr., as he hitchhiked on the roadside near the Parker Dam on the California side of the river. They called the Yuma County Sheriff, and waited to meet the deputy in a restaurant.

Michele's body was discovered six days later on August 10, 1981, in the Black Meadows Landing Dump in San Bernardino County, California, some nine miles from where Michael, Jr., was picked up. The baby girl victim had many disfiguring injuries, including a crushing blow to the skull that occurred before death. Michele's body was partially decomposed. She had a long diagonal incision from below the rib cage to above her pubic region, and an egg-shaped cut between the legs encompassing the location of the vagina, anus, and surrounding supportive tissue. The uterus was also missing, likely removed with another long incision below the rib cage. The pathologist who conducted the autopsy was unable to determine whether the incisions were made before or after death, or whether Michele had been sexually

assaulted because of the missing vagina. Forensic examination revealed no evidence of semen on the remaining parts of the body.

## B

Pensinger was arrested in Midland, Texas, in mid-August 1981 and charged with kidnapping Michele and Michael, Jr., and murdering Michele. Although investigators found a box of blades for a utility knife in the truck, all tests for blood, hair, and fibers were negative. It could not be determined whether a stain on the left front fender of the pickup was human or animal blood. When the police arrested Pensinger, he had bloodstains on his pants, shirt, belt, and boots, but the stains were not compared to the victim's blood in time for the trial.

During Pensinger's pre-trial confinement, more evidence of Michele's murder came to light. When Pensinger was extradited from Texas to Oregon to face unrelated charges there, he was housed in the Washington County Jail with Tony Krossman. Krossman testified that Pensinger told him that he was trying to make bail because he was afraid that warrants would arrive from Arizona and California charging him with kidnapping and murder. Pensinger told Krossman that he had killed someone. The only details Krossman could remember were that Pensinger said the crime happened in Parker or Flagstaff, Arizona, and that he was afraid a blonde woman had seen him in the course of the crime.

After Pensinger was transferred to the San Bernardino County Jail in September 1981, he was housed in an isolation unit next to inmate Gary Howard. Howard provided a much more detailed statement attributed to Pensinger. Howard

testified that Pensinger told him he had picked up a baby in Arizona and killed her. He drove out of town, and when the little girl started crying, he slapped her hard enough to break her ribs, but she did not stop crying. In one conversation Pensinger said that when he stopped to relieve himself, Michael, Jr., ran off. In another conversation Pensinger said that Michael, Jr., was still in the car when he stopped and tried to force the baby to orally copulate him. Howard also stated Pensinger told him that he attempted to have sex with Michele. When he could not do this, he cut her belly and private parts out. He then drove to a dump, put her in a plastic bag, and threw her out. He said he cut the baby with a hunting knife and left her body near Parker Dam. In another conversation Pensinger said that he had removed the sex organs to hide the sexual assault and to make it difficult to identify the baby's sex.

David Hicks, another jailhouse informant, testified that in October 1981, Pensinger asked Hicks if he would kill Howard for $500 because Howard was testifying against Pensinger. Hicks further recounted that Pensinger told him he had been drinking with the Melanders on the day of the crime. After Vickie went into the sheriff's station to report a stolen rifle, Pensinger said he drove off because he was frightened about being in the truck, which Pensinger had stolen from an uncle, and he feared he had outstanding warrants for his arrest from Oregon. He stopped in the desert to urinate and the boy ran off. He drove to a junkyard and "did in" the baby girl. He tried to have sex with her but she was too small so he cut her. He put her in a plastic bag and threw her body in the junkyard. Pensinger told Hicks that he went to the dam and buried the knife. He told Hicks he had not thrown the knife into the water, as he had told Howard. Hicks told officers about the location where Pensinger said he had put the knife.

Officers later recovered a utility knife handle from that location in plain sight on a pile of rocks. It was too weathered to yield any forensic clues.

At trial, all three jailhouse informants denied receiving any benefit for their testimony, but Howard and Hicks were substantially discredited during cross-examination. The investigating officers in the case confirmed that they had offered Krossman, Howard, and Hicks no benefits for their testimony.

Pensinger attempted to show at trial that someone else murdered Michele. The defense case consisted of attacks on the jailhouse informants and Vickie Melander. Pensinger took the stand and testified that after driving Vickie to pick up her children, and stopping at the Turtle Barn Bar, Michael, Jr., informed them of the stolen rifle. He denied becoming enraged or that Vickie ever ran from him. Pensinger stated that he then drove back to the Silver Saddle to see if Vickie's husband would help look for the missing weapon. Vickie asked Pensinger to take her to another bar, the name of which he did not recall, so she could arrange a place to stay for the night.

Pensinger insisted that he dropped Vickie and the children off at the bar, subsequently purchased gas, and stopped and inquired about his rifle at the P.D.Q. Market. He admitted to having been upset and telling store employees that if they had trouble with whoever took the gun, to blow their head off. He then went into a restaurant and talked to a deputy sheriff he saw there, who advised Pensinger to report the loss to the local police. After an unsuccessful search for his rifle, Pensinger drove to Texas. He denied making any confessions to the three jailhouse informants.

At closing, the State argued that when Pensinger left the sheriff's substation, he did not have in mind kidnapping the children or murdering Michele. The prosecutor contended that Pensinger's sole intention at that point was to look for the rifle. It was only after talking to the store clerk that Pensinger "finally decided he's going to take matters into his own hands and strike back. And that's the point where he kidnaps Michael and Michele." The prosecutor did not specify how Pensinger intended to strike back. However, as to the sexual offense charges, the prosecutor argued that he:

> would rather believe that this sex stuff didn't happen. And I really never have strongly argued that it did. [¶] But . . . [h]ow can I say there's no evidence of sexual misconduct when the baby is missing her sexual organs? . . . So then you start asking yourself why did he do it. And you get into these sexual implications. And we always considered that but could never put it together until Howard and Hicks came forward and he's telling them about the sexual angle. That's why those charges are there.

Neither the defense nor the prosecution's theory of the case turned on whether Michele's murder advanced the independent felonious intent of kidnapping.

On August 3, 1982, a California jury convicted Pensinger of two counts of kidnapping and one count of first-degree murder. The jury also found true two special circumstances making Pensinger death-eligible: (1) murder committed in the course of a kidnapping, and (2) murder with the intent to torture the victim. The jury, however, rejected two other

special circumstances: (1) murder in the commission of a lewd act on a child under the age of 14, and (2) murder committed in the course of oral copulation in violation of California Penal Code § 288a.

At issue here are the kidnap-murder special circumstance jury instructions. The trial court instructed the jury using California Criminal Jury Instruction (CALJIC) No. 8.81.17[1]:

> If you find the defendant in this case guilty of murder of the first degree, you must then determine if the murder was committed under one or more of the following special circumstances: One, while said defendant, Brett Patrick Pensinger, also known as Panama Red, was engaged in kidnap[p]ing in violation of California Penal Code Section 207.

The trial court did not include, nor did Pensinger's trial counsel request, paragraph 2 of section 8.81.17 of the CALJIC, which codifies the California Supreme Court's ruling in *People v. Green*,[2] requiring an independent felonious purpose. The second paragraph of the jury instruction reads as follows:

> The murder was committed in order to carry out or advance the commission of the crime of [kidnapping] or to facilitate the escape

---

[1] At the time of Pensinger's trial in 1982, the trial court used CALJIC No. 8.81.17, Fourth Edition 1980 Rev.

[2] 27 Cal. 3d 1 (1980).

> therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the [kidnapping] was merely incidental to the commission of the murder.

CALJIC No. 8.81.17(2). Without the benefit of paragraph 2, the jury found true the kidnap-murder special circumstance and subsequently sentenced Pensinger to death.

## C

Pensinger filed his opening brief on direct appeal on April 8, 1985. He filed his first state habeas petition on June 3, 1985. Five years later, in an opinion deciding the direct appeal and habeas petition, the California Supreme Court affirmed Pensinger's convictions, the kidnap-murder special circumstance finding, and the penalty determination. *People v. Pensinger*, 52 Cal. 3d 1210, 1229, 1257 (1991). However, it reversed Pensinger's torture-murder special circumstance because the jury was not instructed that the special circumstance required proof of intent to inflict torture. *Id.* at 1254–55. The court otherwise denied relief on the habeas petition. *Id.* at 1282. On October 21, 1991, the U.S. Supreme Court denied Pensinger's petition for a writ of certiorari. *Pensinger v. California*, 502 U.S. 930 (1991).

## D

Pensinger initiated his federal habeas proceedings on July 13, 1994. The district court stayed the proceedings pending Pensinger's filing of his state habeas corpus petition to exhaust certain claims. On July 26, 2000, the California

Supreme Court denied Pensinger's state habeas petitions on the unexhausted claims.

The district court then lifted the stay of the federal proceedings, and Pensinger filed an amended petition on October 2, 2000. Ultimately, the district court issued an order granting in part and denying in part Pensinger's habeas petition. *Pensinger v. Chappell*, No. CV-92-1928-DSF (C.D. Cal. Nov. 30, 2012). The district court denied twenty-four claims, dismissed as moot an additional thirty-five, but granted relief on one claim. On that claim (Claim 24), it held that the superior court violated Pensinger's constitutional rights by failing to instruct the jury *sua sponte* in compliance with *People v. Green*, that a kidnap-murder special circumstance requires proof that the kidnapping was committed for an independent felonious purpose (i.e., not merely incidental to the murder). As a result, the district court vacated the kidnap-murder special circumstance and the death sentence. The district court granted a limited certificate of appealability with respect to one subclaim (Claim 12(BB)) on whether Pensinger's trial counsel was ineffective in failing to request a jury instruction in accordance with *People v. Green*. The district court denied a certificate of appealability for twenty-six other claims.

Pensinger appeals the district court's ruling on Claim 12(BB) and requests that the panel expand the certificate of appealability to include a multitude of other claims.[3] The

---

[3] We decline to expand the certificate of appealability to include Pensinger's uncertified claims because Petitioner has not made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (2012); *see Slack v. McDaniel*, 529 U.S. 473, 483 (2000).

State filed a cross-appeal challenging the grant of relief under Claim 24.

## II

We review denials of habeas petitions *de novo*. *Rhoades v. Henry*, 598 F.3d 495, 500 (9th Cir. 2010). AEDPA does not apply here because Pensinger's original federal petition, filed in 1994, preceded AEDPA's enactment. *See Woodford v. Garceau*, 538 U.S. 202, 210 (2003) (holding that AEDPA's application depends on whether the petitioner filed an application for habeas relief seeking an adjudication on the merits after AEDPA's effective date); *see also Lindh v. Murphy*, 521 U.S. 320, 322–23 (1997).

Under the pre-AEDPA standards of review, we review *de novo* questions of law and mixed questions of law and fact. *See Williams v. Taylor*, 529 U.S. 362, 402 (2000) ("Under the federal habeas statute as it stood in 1992, then, our precedents dictated that a federal court should grant a state prisoner's petition for habeas relief if that court were to conclude in its independent judgment that the relevant state court had erred on a question of constitutional law or on a mixed constitutional question."); *Robinson v. Schriro*, 595 F.3d 1086, 1099 (9th Cir. 2010) (explaining that under pre-AEDPA law, federal courts owe no deference to a state court's resolution of law or mixed questions of law and fact). However, "we presume that state court determinations of historical fact are correct." *Payton v. Woodford*, 299 F.3d 815, 822 (9th Cir. 2002) (en banc), *vacated on other grounds by* 538 U.S. 975 (2003); *see also* 28 U.S.C. § 2254(d) (1994); *Woratzeck v. Stewart*, 97 F.3d 329, 332 (9th Cir. 1996); *McKenna v. McDaniel*, 65 F.3d 1483, 1490 (9th Cir. 1995).

Here, the California Supreme Court's ruling on whether or not the *Green* instruction applies is a question of law reviewed *de novo*.

### III

Before addressing the merits of the habeas petition, we consider the State's request that we exercise our discretion to invoke *sua sponte* the non-retroactivity bar of *Teague v. Lane*. *Teague* bars a federal court from retroactively applying "new constitutional rules of criminal procedure" on collateral review. 489 U.S. at 310. If we were to invoke our discretion, we would need to determine whether *Green*'s "independent felonious purpose" element for a kidnap-murder special circumstance, *see Williams v. Calderon*, 52 F.3d 1465, 1476 (9th Cir. 1995), would constitute a new constitutional rule of criminal procedure under *Teague*. Following oral argument, we requested supplemental briefing to address (1) what factors should inform our consideration whether to exercise our discretion to invoke *Teague* if we found waiver by the State; and (2) if we decided nonetheless to exercise our discretion, whether a *Teague* exception applied in light of *Webster v. Woodford*, 369 F.3d 1062, 1067–69 & n.2 (9th Cir. 2004), *Gilmore v. Taylor*, 508 U.S. 333, 339–45 (1993), *Lambrix v. Singletary*, 520 U.S. 518, 539–40 (1997), and *Clark v. Brown*, 450 F.3d 898, 904–09 (9th Cir. 2006).

"[C]ourts of appeals have [the] *discretion*, but are not *required*, to address a *Teague* defense raised for the first time on appeal (or, perhaps, even in a petition for rehearing)." *Boardman v. Estelle*, 957 F.2d 1523, 1536–37 (9th Cir. 1992); *see Collins v. Youngblood*, 497 U.S. 37, 41 (1990) ("Although the *Teague* rule is grounded in important considerations of federal-state relations, we think it is not

'jurisdictional' in the sense that this Court, despite a limited grant of certiorari, *must* raise and decide the issue *sua sponte*."). Here, despite numerous opportunities to do so, the state repeatedly failed to raise the *Teague* defense as to the *Green* error. First, the state did not mention the defense as to Claim 24 in its answer to Pensinger's first amended habeas petition before the district court, even though it argued *Teague* as to several other claims in its answer. *See Schiro v. Farley*, 510 U.S. 222, 228–29 (1994); *Duckett v. Godinez*, 67 F.3d 734, 746 n.6 (9th Cir. 1995) (a state waives the *Teague* defense by not raising it in district court). Then, a full year prior to ruling on Pensinger's petition, the district court requested supplemental briefing "on the merits of Petitioner's Claim 24 and on *any procedural bar(s) to the claim*." (Emphasis added). The State's supplemental briefing—again—failed to raise *Teague* as a procedural bar. Finally, following the district court's grant of Pensinger's petition on the basis of Claim 24, the State raised *Teague* in its motion to alter the judgment.

On this appeal, the State once again failed to properly allege its *Teague* defense. The State's appellate brief raises *Teague* "only in passing" in a single paragraph towards the end of the brief without identifying "the new rule of constitutional law[,] . . . why such a rule would not have been compelled by existing precedent . . . , [and] why the rule contended for is not within one of *Teague*'s exceptions." *Arredondo v. Ortiz*, 365 F.3d 778, 781–82 (9th Cir. 2004) ("If a state seriously wishes to press *Teague* upon us, at a minimum *Teague* should be identified as an issue (indeed, the first issue) on appeal."). In response to our request for supplemental briefing, the State admitted that it did not comply with the strictures of *Arredondo* in asserting the *Teague* defense on appeal.

In fairness, and despite Pensinger's valid conviction for Michele's murder and the kidnapping charges, on this record we cannot save the State from its repeated mistakes. Thrice the State "inadvertently" failed to properly assert *Teague*. The State offers no excuse for failing to raise *Teague* below. Nor does the State offer an excuse for failing to comply with *Arredondo* on appeal to us.

Its arguments to support our exercise of discretion are likewise unavailing. The State argues that failure to consider *Teague* would be "pointless" because Pensinger would not be entitled to a *Green* instruction on retrial based on the California Supreme Court's current interpretation of when the Eighth Amendment triggers the independent felonious intent requirement in the kidnap-murder special circumstance statute. While it is true that "the views of the federal courts of appeals do not bind the California Supreme Court when it decides a federal constitutional question," *Johnson v. Williams*, ___ U.S. ___, 133 S. Ct. 1088, 1098, *reh'g denied*, 133 S. Ct. 1858 (2013), "[t]he granting of a new trial places the parties in the same position as if no trial had been had," Cal. Penal Code § 1180 (West 2015). In other words, Pensinger could present new evidence and arguments that would warrant a *Green* instruction under California's interpretation of the Eighth Amendment. Furthermore, the State's argument that a retrial of the special circumstance and penalty phase in a 33-year-old case would be costly is disingenuous—while we are sympathetic to the dilemma, the problem is one of its own making.

Given the extent of the State's persistent waiver, its lack of adequate explanation, and unconvincing arguments in supplemental briefing, we decline to reach the *Teague* bar *sua sponte*. *See Godinez v. Moran*, 509 U.S. 389, 397 n.8 (1993)

(declining to reach *Teague* defense "because petitioner [State warden] did not raise a *Teague* defense in the lower courts or in his petition for certiorari"); *see also Schiro*, 510 U.S. at 229 (same); *Arredondo*, 365 F.3d at 781 (declining to address *Teague* defense because it was "simply mentioned but not argued" (citation omitted)); *Garceau v. Woodford*, 281 F.3d 919, 920 (9th Cir. 2002). As a result, our decision in *Williams v. Calderon* controls our review of Pensinger's pre-AEDPA federal habeas petition. 52 F.3d 1465.

## IV

On the merits, the State challenges the district court's holding that the trial court violated Pensinger's constitutional rights by failing to instruct the jury *sua sponte* that—in order to find the kidnap-murder special circumstance true—there must be proof that the kidnapping was committed for an independent felonious purpose. Alternatively, even if a *Green* instruction was constitutionally required, the State contends the error was harmless. We agree with the district court that an instructional error occurred which was prejudicial, and affirm its grant of relief on the basis of Claim 24.

## A

California's death penalty statute requires the jury to find the existence of special circumstances to distinguish between defendants who are eligible for the death penalty and those who are not. *See* Cal. Penal Code § 190.2 (1978); *Williams*, 52 F.3d at 1475–76; *Green*, 27 Cal. 3d at 61. The felony-murder special circumstance applies to those murders "committed while the defendant was engaged in . . . the commission of . . . or the immediate flight after committing"

one of certain enumerated felonies, including kidnapping. Cal. Penal Code § 190.2(a)(17)(B). At the time of Pensinger's offense (1981) and trial (1982), the felony-murder special circumstance already required that the defendant have "an independent felonious purpose." *Green*, 27 Cal. 3d at 61; *see Clark*, 450 F.3d at 915 (holding that Clark was constitutionally entitled to a *Green* instruction because Clark committed his crime in January 1982 and "the CALJIC instruction in place at the time of trial . . . had specifically incorporated *Green*'s holding").

The California Supreme Court developed this independent felonious purpose requirement to comply with the U.S. Supreme Court's rulings in *Furman v. Georgia*, 408 U.S. 238 (1972), and *Gregg v. Georgia*, 428 U.S. 153 (1976). There, the Supreme Court found unconstitutional under the Eighth and Fourteenth Amendments death sentences imposed under statutes that left juries with untrammeled discretion to impose or withhold the death penalty. *Furman*, 408 U.S. at 313 (White, J., concurring); *Gregg*, 428 U.S. at 189, 199. *Furman* and *Gregg* held that imposition of the death penalty should compel the jury to "focus on the particularized circumstances of the crime and the defendant" in order to reduce "the risk of wholly arbitrary and capricious" death sentences. *Gregg*, 428 U.S. at 189, 199.

Guided by *Furman* and *Gregg*, *Green* explained that California's felony-murder special circumstance statute "expressed a legislative belief that it was not unconstitutionally arbitrary to expose to the death penalty those defendants who killed in cold blood in order to advance an independent felonious purpose, e.g., who carried out an execution-style slaying of the victim of or witness to a holdup, a kidnap[p]ing, or a rape." *Green*, 27 Cal. 3d at 61.

In other words, "*Green* held that a felony whose 'sole object is *to facilitate* or conceal *the primary crime*' of murder is 'incidental,' and therefore does not qualify a defendant for the death penalty under the special circumstance statute." *Clark*, 450 F.3d at 905–06 (emphasis added) (citing *Green*, 27 Cal. 3d at 61). Thus, "under *Green*, a felony qualifie[s] under the special circumstance statute only if two requirements [a]re satisfied: (1) the felony, such as robbery or arson, must have been committed for a purpose 'independent' of the murder, and (2) the murder must have been committed in order to advance that 'independent felonious purpose.'" *Id.* at 910; *see also Phillips v. Ornoski*, 673 F.3d 1168, 1193 (9th Cir. 2012).

For instance, in *Clark* under the defendant's theory of the case, "he set the fires [to the home] only for the purpose of driving David Gawronski out of the house so that he could shoot him." *Clark*, 450 F.3d at 908. Clark argued that he did not have an "an independent felonious purpose in committing arson." *Id.* (internal quotation marks omitted). We held "Clark was entitled to an instruction that told the jury he was not guilty of the special circumstance if the arson was a felony whose 'sole object [was] to facilitate . . . the primary crime' of murder." *Id.* (citing *Green*, 27 Cal.3d at 61).

Similarly, in *Green*, a husband killed his wife and subsequently took her clothes, rings and purse in order to conceal her identity. *Green*, 27 Cal. 3d at 55. "The California Supreme Court held that this felonious robbery of the wife's belongings was insufficient to support a felony-murder special circumstance conviction because Green did not commit the robbery for a reason independent of the murder, and then commit the murder to advance the purpose of committing the robbery." *Clark*, 450 F.3d at 906.

"Rather, Green committed the robbery in order to facilitate or conceal the murder." *Id.* "In other words, the robbery was 'incidental' to the murder." *Id.*

However, since the *Green* decision, the California Supreme Court has narrowed the application of the *Green* instruction, while the Ninth Circuit has adopted *Green*'s broad holding. *Compare People v. Kimble*, 44 Cal. 3d 480, 501 (1988), *with Williams*, 52 F.3d at 1476, *and Clark*, 450 F.3d at 910–11 ("[T]he California Supreme Court significantly changed the first requirement and entirely dispensed with the second . . . that the murder have the purpose of advancing the 'independent felonious purpose' of the arson.").

Under California's current interpretation of *Furman*, *Gregg*, and the Eighth Amendment, a *Green* instruction is not always required. The California Supreme Court has held that the *Green* instruction "does not set out a separate element of the special circumstance" but rather acts to clarify that the murder must have taken place in furtherance of the accompanying special-circumstance felony. *People v. Harris*, 43 Cal. 4th 1269, 1299 (2008); *see Kimble*, 44 Cal. 3d at 501 ("[W]e reject the dissent's novel suggestion that *Green*'s clarification of the scope of felony-murder special circumstances has somehow become an 'element' of such special circumstances, on which the jury must be instructed in all cases . . . ."); *People v. Monterroso*, 34 Cal. 4th 743, 767 (2004). This is important because "[a] trial court has a sua sponte duty to instruct the jury on the essential elements of a special circumstance allegation." *People v. Mil*, 53 Cal. 4th 400, 409 (2012) (internal citations omitted).

The State heavily relies on California's current interpretation to support the contention that no Eighth Amendment violation occurred in instructing the jury. Because the *Green* instruction (i.e., the second paragraph of CALJIC No. 8.81.17) does not constitute an element of the crime of special-circumstances murder, the State argues that the instruction is necessary only in limited circumstances. In support of its argument the State notes that the California Supreme Court has previously held that "a trial court has no duty to instruct on the second paragraph of CALJIC No. 8.81.17 unless the evidence supports an inference that the defendant might have intended to murder the victim without having had an independent intent to commit the specified felony." *People v. D'Arcy*, 48 Cal. 4th 257, 297 (2010).

However, the State fails to meaningfully distinguish the case we must follow, *Williams v. Calderon*, 52 F.3d 1465. In *Williams*, the petitioner challenged the kidnap-murder special circumstance, arguing that the trial court erred by failing to provide the jury a *Green* instruction and therefore "the jury's finding this circumstance true was [] invalid." *Id.* at 1475. We agreed that an "instructional error occurred" and interpreted the *Green* decision as requiring an instruction on the independent felonious purpose. *Id.* at 1475–76. We further characterized the *Green* instruction as a "constitutional necessity, not mere state law nicety, for without this narrowing construction, the special circumstance would run afoul" of *Furman* and *Gregg*. *Id.* at 1476.

The State attempts to distinguish *Williams* by arguing that we did not reach the issue of whether or not a *Green* instruction was necessary in all special circumstance cases. A careful reading of the case, however, persuades us that *Williams* did indeed reach such a conclusion. Similar to the

trial court in Pensinger, the trial court in *Williams* gave a jury instruction commensurate with the first paragraph of CALJIC No. 8.81.17, but omitted the second paragraph of that instruction.[4] *Williams v. Vasquez*, 817 F. Supp. 1443, 1482 (E.D. Cal. 1993). Considering our view of the *Green* instruction as a "constitutional necessity" in combination with the holding that an "instructional error occurred" when the trial court gave only the first half of CALJIC No. 8.81.17, *Williams* implicitly held that both paragraphs of CALJIC No. 8.81.17 were necessary to fulfill the strictures of *Furman* and *Gregg*.[5] Therefore, because Pensinger's kidnap-murder

---

[4] The instruction given in *Williams* was:

> [i]t is further charged that [defendant] was personally present and physically aided or committed the acts causing the death of Lourdes Meza and that the murder of Lourdes Meza was willful, deliberate and premeditated and was committed during the commission or attempted commission of kidnapping in violation of Section 207 of the California Penal Code.

*Williams v. Vasquez*, 817 F. Supp. at 1482. The instruction in Pensinger was:

> If you find the defendant in this case guilty of murder of the first degree, you must then determine if the murder was committed under one or more of the following special circumstances: One, while said defendant, Brett Patrick Pensinger, also known as Panama Red, was engaged in kidnap[p]ing in violation of California Penal Code Section 207.

[5] We are not alone in interpreting *Green* as requiring an independent felonious purpose instruction in all felony-murder cases to comply with the Constitution. *See Kimble*, 44 Cal. 3d at 517 (Mosk, J., dissenting) ("In *Green*, the court squarely held that the felony-murder special circumstance must be construed to require a finding of independent felonious purpose.

special circumstance jury instructions failed to comport with *Furman*, *Gregg*, *Green*, and *Williams*, the district court correctly concluded that an instructional error occurred.

"Where the error involves a failure to provide a narrowing instruction on a death special circumstance, we begin by asking whether it can be concluded, in light of the other instructions, that the jury necessarily found the omitted narrowing element." *Williams*, 52 F.3d at 1476. Though not clear from its brief, the State seems to argue that because the jury was instructed on the elements of first-degree murder and kidnapping separately from the requirement for a special circumstance murder, the jury necessarily found the independent felonious intent. We found a similar argument insufficient in *Williams* and we are bound by that holding to reach the same conclusion here. *See Williams*, 52 F.3d at 1476.

Under *Williams*, where there is more than one plausible explanation for the defendant's actions, we cannot conclude that the jury necessarily made the required independent felonious purpose finding. *Id.* at 1476–77. Here, the district court found that under the kidnapping jury instruction, the jury could have convicted Pensinger of Michele's kidnapping because it believed Pensinger kidnapped her "to inflict death"—under these facts, to murder Michele, Pensinger necessarily had to move her, making the kidnap "incidental"

---

. . . [T]he majority's attempt to present advancement of an independent felonious purpose as merely a kind of nonessential 'clarifying' or 'amplifying' gloss is unsuccessful.").

to the murder.[6]  The jury could also have convicted Pensinger of Michael, Jr.'s, kidnapping because it believed Pensinger kidnapped Michael, Jr., to "aid in the commission of [the] felony" of murdering Michele.  In both circumstances, the jury would not have found a purpose for kidnapping independent of Michele's murder.  On the other hand, the jury could have concluded that Pensinger kidnapped Michele with the independent purpose of molesting her, and that he formed the intent to murder her after the kidnapping.  Because evidence of Pensinger's intent is subject to more than one interpretation, we cannot conclude the jury necessarily found the omitted narrowing element.  *Id.*  The district court

---

[6] The superior court provided the following kidnapping jury instruction:

> If a person moved away is incapable of consenting thereto by reason of immaturity or mental condition, then the person moving him away is guilty of kidnapping only if you are convinced beyond a reasonable doubt that before the movement the person formed a specific intent to do the moving for an illegal purpose or with an illegal intent and only if you are convinced beyond a reasonable doubt that he knowingly or having reason to know that he had no legal right to do so took, enticed, or kept from the legal custodian a child less than eighteen years of age without the custodian's consent and only if you're convinced beyond a reasonable doubt that he knowingly restrained another person with the *intent to*, [1] hold the victim for ransom, as a shield or hostage; or [2] for involuntary servitude; or [3] *to inflict death*, physical injury, child endangering or sexual offenses on the victim, to detain or conceal such child from a parent, or to *otherwise aid in the commission of a felony*; or [4] place the victim or a third person in the reasonable apprehension of imminent physical injury to the victim or such third person.  (Emphasis added).

properly found the remaining jury instructions did not cure the error.

Next, we consider whether the California Supreme Court cured the invalid instruction, and, if not, whether that omission was harmless under *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

## B

The California Supreme Court can cure an invalid instruction in two ways. *Morales v. Woodford*, 388 F.3d 1159, 1171 (9th Cir. 2004). First, it can affirm the trial court if it finds beyond a reasonable doubt that the same result would have been obtained "without relying on the unconstitutional aggravating circumstance"—that is to say, the error was harmless. *Id.* (citing to *Valerio v. Crawford*, 306 F.3d 742, 756–57 (9th Cir. 2002) (en banc)). Second, the California Supreme Court can invoke the method described in *Clemons v. Mississippi*, 494 U.S. 738, 748 (1990), by re-weighing the aggravating and mitigating circumstances to test whether the verdict could stand without the improperly introduced factor. *Id.*

Here, because the California Supreme Court did not find error in the kidnap-murder special circumstance finding, it did not attempt to cure the invalid jury instruction. *Pensinger*, 52 Cal. 3d at 1255–56. Instead, it held that there was "no substantial evidence that defendant's sole purpose at the inception of the kidnapping was to murder [the baby]." *Id.* at 1255.

"In the absence of the requisite 'close appellate scrutiny' by the state courts" a federal appellate court must conduct its own harmless error analysis. *Morales*, 388 F.3d at 1171.

## C

An error in the instruction of a death penalty special circumstance is subject to *Brecht*'s harmless error review. *Williams*, 52 F.3d at 1476; *see also Morales*, 388 F.3d at 1171–72. Under *Brecht*, an error is harmless unless it can be found that it "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)) (internal quotations marks omitted). A habeas petitioner must establish that the error resulted in "actual prejudice." *Id.* (internal quotation marks omitted). However, where a judge in a habeas proceeding is in "'grave doubt as to the harmlessness of the error,' the habeas 'petitioner must win.'" *California v. Roy*, 519 U.S. 2, 5–6 (1996) (citing *O'Neal v. McAnnich*, 513 U.S. 432, 437 (1995)). We have previously noted that an error is "not harmless as a matter of law" when "our invalidation of the special circumstance eliminated the only remaining special circumstance." *Morales*, 388 F.3d at 1172 (citing to *Wade v. Calderon*, 29 F.3d 1312, 1322–23 (9th Cir. 1994), *overruled on other grounds by Rohan ex rel. Gates v. Woodford*, 334 F.3d 803, 815 (9th Cir. 2003)).

Here, the jury found Pensinger eligible for the death penalty without having to make any determination whether there was an "independent felonious purpose" to the kidnapping of Michele Melander. Although the prosecutor presented evidence of at least two different independent

purposes for Michele Melander's kidnapping,[7] the instruction given to the jury required the jury to find only that the murder occurred while Pensinger was "engaged in kidnapping in violation of California Penal Code Section 207." Thus, it was possible for the jury merely to find that the kidnapping was incidental to the murder—that is, during the course of committing murder, Pensinger "happen[ed] to engage in ancillary conduct that technically constitutes [a kidnapping] or one of the other listed felonies." *See Green*, 27 Cal. 3d at 62. Finally, the only special circumstance which remains upholding Pensinger's death sentence is the deficient kidnap-murder special circumstance. *Cf. Williams*, 52 F.3d at 1479–80 (finding no prejudice on *Green* instructional error because the jury found several other valid special circumstances). "When a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process. It is not enough to instruct the jury in the bare terms of an aggravating circumstance that is unconstitutionally vague on its face." *Walton v. Arizona*, 497 U.S. 639, 653 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002) (citing *Maynard v. Cartwright*, 406 U.S. 356 (1988), and *Godfrey v. Georgia*, 446 U.S. 420 (1980)). Therefore, we cannot here uphold the kidnap-murder special circumstance on a harmless error theory. The district court properly granted Pensinger's petition on the basis of Claim 24.

---

[7] The State's two different theories were: (1) Pensinger wanted to and did sexually molest Michele; and (2) Pensinger wanted to "strike back" at Vickie Melander and her husband for the theft of his rifle.

**V**

Finally, we consider Pensinger's contention that his trial counsel was ineffective in failing to request a jury instruction in accordance with *People v. Green*, during the guilt phase.

A meritorious ineffective assistance of counsel claim must demonstrate: (1) "that counsel's representation fell below an objective standard of reasonableness"; and (2) that the deficient performance prejudiced the defense, which requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

Under the pre-AEDPA standard of review, a state court's conclusion as to whether counsel rendered ineffective assistance is a mixed question of law and fact, *id.* at 698, subject to *de novo* review, *Williams*, 529 U.S. at 400. However, the state court findings of fact made in the course of deciding an ineffectiveness claim are questions of fact, subject to "a presumption of correctness." *Thompson v. Keohane*, 516 U.S. 99, 111 (1995); *Lambert v. Blodgett*, 393 F.3d 943, 976 (9th Cir. 2004). "Consequently, a federal court reviewing a state court conclusion on a mixed issue involving questions both of fact and law must first separate the legal conclusions from the factual determinations that underlie it." *Lambert*, 393 F.3d at 977–78.

**A**

A counsel's performance is deficient if his or her representation was unreasonable "under prevailing professional norms." *Strickland*, 466 U.S. at 688. "Judicial

scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Id.* at 689. The court "must indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted).

Where counsel pursues one theory of the defense over another, counsel's lack of request for a jury instruction on the alternate theory does not constitute deficient performance. *See Clabourne v. Lewis*, 64 F.3d 1373, 1382–83 (9th Cir. 1995) ("Clabourne was pursuing an insanity defense, and that defense might have been less credible if Clabourne had disavowed his confession. . . . [Thus,] the failure to request a voluntariness instruction [regarding his confession] . . . did not amount to ineffective assistance."); *United States v. Chambers*, 918 F.2d 1455, 1461–62 (9th Cir. 1990) ("Chambers' trial counsel chose to pursue an identity defense rather than challenge Chambers' possession of the cocaine. . . . [T]rial counsel did not render deficient performance by failing to request a [possession] instruction.").

Here, the district court relied on *Clabourne* and *Chambers*, holding that failure to request a *Green* instruction would meet the prejudicial prong of the *Strickland* standard, but not the deficient performance prong. We agree. Defense counsel's theory was that Pensinger did not kidnap or murder Michele. Instead, he argued that Vickie, Michele's mother,

had both the motive and opportunity to have Michele killed.[8] Thus, requesting a jury instruction requiring Pensinger to have an independent felonious purpose in kidnapping Michele did not comport with defense counsel's theory of the case that Pensinger did not murder Michele.

Pensinger contends that the facts in *Clabourne* and *Chambers* are distinguishable because Pensinger's *Green* instruction was not an instruction that the defense had to request. Rather, that since the *trial court* had a duty to instruct the jury, by extension, *trial counsel* was ineffective in not asking for the instructions on all basic elements of the kidnapping special circumstance, including the *Green* instruction. Pensinger inappropriately conflates the trial court's duty with counsel's. Because Pensinger's defense theory was that he did not kidnap the children or murder Michele, defense counsel did not have a duty to request a *Green* instruction and, consequently, his failure to request one did not render his performance deficient. *Chambers*, 918 F.2d at 1461–62; *Clabourne*, 64 F.3d at 1382–83. Therefore, the district court properly denied Pensinger's petition for relief on the basis of Claim 12(BB).

## VI

The facts of five-month-old Michele's murder are horrific. While Pensinger's convictions for the first-degree

---

[8] At closing, defense counsel argued that at the time of the murder Vickie felt desperate, had two children, was pregnant with a third, had no place to stay, and was married to a man who would not work. Defense counsel argued that Vickie's children interfered with the way she wanted to live, and that Vickie did not have the money for the special formula that Michele's medical condition required.

murder of Michele Melander and the kidnapping of Michael, Jr., and Michele are unaffected by our decision—under our pre-AEDPA case law—the district court properly vacated the kidnap-murder special circumstance finding, which alone supported Pensinger's death sentence. Under *Williams v. Calderon*, an instructional error occurred when the trial court omitted the *Green* instruction requiring the jury to find an independent felonious purpose to kidnap Michele. *Williams*, 52 F.3d at 1476. Even in light of other instructions, the jury did not necessarily find the independent felonious purpose. And, under *Brecht*, the omission of the *Green* instruction in the kidnap-murder special circumstance was not harmless as a matter of law because our invalidation would eliminate the only remaining special circumstance supporting the capital sentence imposed.

The district court properly denied Pensinger's ineffective assistance of counsel claim because trial counsel's failure to request a *Green* instruction comported with the theory of his defense.

**AFFIRMED.**